James Corbett **CHURDER**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 18740.

United States Court of Appeals
Eighth Circuit.

Jan. 9, 1968.

826

Robert J. O'Hanlon, St. Louis, Mo., for appellant and filed brief.

Harold F. Fullwood, Asst. U. S. Atty., St. Louis, Mo., for appellee, Veryl L. Riddle, U. S. Atty., on the brief.

Before VOGEL, Chief Judge, and MATTHES and BLACKMUN, Circuit Judges.

**BLACKMUN, Circuit Judge.**

James Corbett Churder, age 36, after a plea of not guilty, was convicted by a jury in January 1967 on a one-count indictment charging him with violating 18 U.S.C. § 641.[1] Specifically, the charge was that he concealed and retained 2194, more or less, stolen United States postal money orders and various money order equipment, therein described, all the property of the United States and of a value in excess of $100, with intent to convert the same to his own use and gain and then knowing the items to have been stolen. Chief Judge Harper imposed a sentence of 8 years. Churder appeals.

The defense asserts that the trial court erred (1) in failing to sustain the defendant's motion to suppress evidence obtained as a result of a search and seizure following his arrest and in admitting into evidence items so seized, and (2), because of failure of proof as to value, in overruling the defense motion for acquittal and in imposing a sentence of a length beyond that allowed by § 641.

There is no real dispute as to the facts. Churder was arrested in the early afternoon of Sunday, November 20, 1966. Postal Inspector Thorn, in a helicopter, was following Churder's car as the latter drove south on Kingshighway in Saint Louis. In the 3200 block south Churder parked on the shoulder of the road. At Thorn's direction other inspectors drove up and arrested the defendant as he emerged from the automobile. The officers searched him, located the key to the car's trunk in one of his shoes, opened the trunk and found there the stolen articles which are the subject of the indictment. The inspectors possessed no arrest or search warrant.

Prior to trial the defense moved, under Rule 41(e), Fed.R.Crim.P., to suppress as evidence all items taken by the search and seizure. A hearing on this motion was held and evidence was presented on the issue of probable cause. Inspector Thorn, called by the defense, testified that on the morning of November 20 he was in his helicopter and first observed Churder when he was walking in the parking lot at the King Brothers Motel;

---

1. § 641. Public money, property or records

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States * * * or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

that he saw him enter his car; and that he did not see Churder then do anything that constituted a violation of law. On cross-examination by the government Thorn stated that at the time he was in communication with other postal inspectors by radio; that he was observing the motel lot because he "had information that Mr. Churder might have United States postal money orders and other related money order equipment"; that "he had been making investigations on these and other money orders almost on a continuing basis for at least two months"; that "I * * * first received information back in September from a confidential source and I began an investigation at that time"; that the investigation was reasonable in comparison with the information received; that as a result of the investigation he would say that the information received was reliable; that while he was in the helicopter on November 20 he conversed by radio with a man [identified on redirect as the second informer] who had Churder under observation and who then reported that Churder "did have in his possession United States postal money orders and related equipment"; that he knew these items were government property; that he had knowledge of recent post office burglaries at five named Missouri points, of attempted burglaries at two other named Missouri points, and of two burglaries "over in Illinois"; that there were close to 2200 money orders and other items missing in the five burglaries; and that he conveyed this information to the men who were working with him.

On redirect Inspector Thorn stated that his informer told him that Churder back in September had postal money orders. A question as to the identity of that informer was objected to and this objection was sustained. Thorn had never used that informer before September. The informer did not tell him where the defendant kept the money orders or where he obtained them or where they could be found. Another informer also told him that Churder would have money orders. He talked with that informer at the King Brothers Motel when the informer was equipped with a walkie-talkie. This second informer had given Thorn information before but he had never used him to make an arrest. Thorn had found this informer to be reliable. The trunk was opened when the automobile was on Kingshighway and was photographed but "to keep from attracting an undue crowd on a Sunday afternoon" the car was moved to the post office garage and the material was then removed from it.

The defense called Postal Inspector Johnson. He testified that he arrested Churder on November 20 and that he had been told by Thorn that Churder was transporting stolen money orders. On cross-examination he testified that 15 seconds elapsed between the arrest and the search. Inspector Nidiffer, also called by the defense, testified that on that morning he first observed the defendant on the motel lot walking with another person. On cross he said that the arrest and search were contemporaneous.

At the trial itself the same testimony was forthcoming plus the fixing of the five Missouri burglaries in August, September and October 1966.

Churder took the stand and was the only witness for the defense. He testified: He had been a bricklayer for 15 years but also, for about two and a half years, worked as a doorman and maitre d' at the Gilded Cage in Saint Louis. In November 1966 he received a call from Leonard Aron [2] and met Aron at his coin shop on Manchester Avenue. After that meeting Churder called a private detective, John Murphy, whom he had known. "I told him that I thought I had some-

---

2. This is the Leonard Aron whose trial on a two-count indictment for violations of the same § 641 took place in October 1966 and thus preceded both the arrest and prosecution of Churder. Aron was convicted by a jury on his two counts. He received a sentence of 10 years on each count, with the sentences to be served concurrently. On appeal the judgment of conviction was affirmed. Aron v. United States, 382 F.2d 965 (8 Cir. 1967).

thing for him on money orders and counterfeit money". He also saw a man named Bayless who came to the club. Bayless gave the defendant one money order which the defendant showed to Aron. Aron told the defendant that "he had a buyer in Minneapolis and one in Kansas City". A man named George Matsik came to the defendant's apartment on the morning of November 20th. He said he was sent by Bayless "and he had a box to put in my car". The box was a suitcase. It was placed in the trunk of the automobile. Having been instructed by Aron to meet him at the King Brothers Motel, the defendant drove there. Aron arrived. They talked. Aron said he wanted to see the suitcase. They drove off together. The defendant showed the suitcase to him somewhere on Fee Fee Road. Aron was "going to buy these from" the defendant. The defendant left Aron and started home. He drove to the Thrift Hardware Store on South Kingshighway where he was to meet Matsik and Bayless and transfer the box to them. When he stepped out of his car he was placed under arrest.

Churder further testified that the arresting officers asked whether he knew the money orders were stolen and that he said, "Yes, I did". When the officers asked why he had the money orders he explained, "I was to meet this Leonard Aron and in meeting him I was to make a sale through him to a group out of Kansas City or Minneapolis". Churder called Murphy from their office. Churder also testified that he had never been convicted of a crime. On cross-examination the defendant stated that he had not bothered to look up the postal inspectors although he knew that this type of offense was within the province of their duties.

Churder's defense, therefore, was the absence of the intent required by the statute.

This case, as do so many others, reeks of guilt and contrived excuse. But guilt or innocence, of course, is not among the issues before us. We pass on to those issues.

A. The search and seizure. The defense breaks this down into what it describes as lack of probable cause, the existence of sufficient time to obtain an arrest warrant, non-disclosure of the identity of the two informers, and the improper search of the automobile.

1. Probable cause. As to this the defense stresses (a) the absence of arrest and search warrants; (b) that Thorn, on the day of the arrest, observed nothing from his helicopter except innocent acts; (c) that the first informer was only said to be reliable and the foundation for that reliability was never demonstrated; (d) that the second informer similarly was only said to be reliable and had never been used for an arrest; (e) the silence of the record as to whether the informers were paid or were witnesses to the crime or were accomplices; (f) the nonrevelation of the underlying circumstances from which the second informer concluded that Churder had money orders in his possession; (g) that the arresting officers did not see any stolen property before the arrest or hear any conversation between Churder and anyone else; and (h) the absence of evidence of their prior personal knowledge of the defendant. All this, it is said, does not add up to probable cause.

These search and seizure cases are not the easiest to resolve. In Spinelli v. United States, 382 F.2d 871 (8 Cir. en banc 1967), petition for certiorari pending, we considered the issue of probable cause for the issuance of a search warrant. Judge Gibson, speaking for the majority, observed, p. 881, "Probable cause is more than suspicion, but it is far less than the evidence sufficient to justify the conviction", and went on to say that informer statements may serve as the basis for probable cause if they are reasonably corroborated by other matters brought to the attention of the magistrate. We noted, in particular, McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), and Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), both of which involved non-warrant arrests and subse-

quent searches, and in each of which the arrest was based upon an informer's information corroborated only by the presence of the defendant at the time and place specified by the informer, plus, in *Draper*, the correspondence of the accused with the description given by the informer.

We conclude that we have here far more than mere suspicion, and the observance of only innocent acts, and the suggestions of untried and unproved informers. And we are concerned with an arrest in a public place and not with one in a dwelling. Compare Gillespie v. United States, 368 F.2d 1 (8 Cir. 1966). We have (a) the fact of five Missouri post office burglaries in recent months, of two attempted burglaries, and of two more burglaries in nearby Illinois; (b) the taking in those burglaries of a large quantity of money orders and money order equipment;[3] (c) Inspector Thorn's knowledge of the burglaries and attempted burglaries; (d) the first informer's statement in September that Churder "might have" money orders and money order equipment; (e) the second informer's statement on November 20 that Churder then did have such property in his possession; (f) the advice to Thorn that Churder would be on the King Brothers Motel parking lot around a specified time that Sunday morning; and (g) Churder's actual presence at that place at that time.

We feel that, although, as always, the defense suggests the point conceivably could have been developed in greater detail at the hearing on the motion to suppress, these factors, in the aggregate, provide the reasonable corroboration called for by Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed. 2d 697 (1960), and Gullett v. United States, 387 F.2d 307 (8 Cir. 1967), satisfy the practical, prudent man standard of Beck v. State of Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), and bring this case well within *McCray* and *Draper* on the issue of probable cause.

2. Time for a warrant. It is no answer to this to say that, because the investigation had been continuing for some weeks, the officers had ample time to seek an arrest warrant and therefore should have done so. We recognize that a preference is to be accorded a search under a warrant over one without a warrant. Aguilar v. State of Texas, 378 U.S. 108, 110–111, 84 S.Ct. 1509, 12 L. Ed.2d 723 (1964); United States v. Ventresca, 380 U.S. 102, 106, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Biondo v. United States, 348 F.2d 272, 273 (8 Cir. 1965). However, November 20, 1966, was a Sunday and it was only on that very Sunday morning that the second informer advised Inspector Thorn that Churder then actually did have money orders and equipment in his automobile. This necessitated prompt action directed to a moving vehicle about to be on its way in its transportation of stolen government property.

In Lee v. United States, 363 F.2d 469, 472 (8 Cir. 1966), cert. denied 385 U.S. 947, 87 S.Ct. 323, 17 L.Ed.2d 227, Judge Gibson said, "Where there is probable cause for the arrest of a person for a felonious offense, the absence of a warrant is immaterial. * * * The mere fact that the Government might have had sufficient time to obtain a warrant for his arrest would not invalidate an otherwise legal arrest", and, on p. 473, "An arrest warrant is not required even though there may be time to obtain one when the ensuing arrest is based upon probable cause". On this point the *Lee* case is not dissimilar to this one. For some days information about Lee had been received from a confidential source and the FBI was investigating. He was placed under surveillance on a specified day in a specified restaurant. The afternoon of the next day information came in that Lee would be at the Saint Louis airport that evening with securities in his possession. He was at the airport that evening and he was arrested without a warrant. We upheld the arrest. *Lee*,

---

3. At the trial witnesses identified items found in the automobile trunk as property taken in those burglaries.

it seems to us, is controlling here and we so hold. We do not mean to imply or to negate the general rule that a warrant is the preferred route. At the same time, we are disinclined to raise almost insuperable barriers for the law enforcement officer who must act promptly upon freshly received information the value and effect of which, if there is significant delay, will evaporate and be lost forever. We stress again that our situation here is one of fixed identity, of positive information, of transportation by automobile, and, with inaction, of likely disappearance of the stolen property to a fence in another city. Under these circumstances, we fail to perceive any impingement of constitutional rights.

3. Identity of the informers. The defense claims that disclosure was necessary in order to enable it to rebut the inspectors' conclusion that the information they received was credible. McCray v. State of Illinois, supra, is cited as an example of the informational detail needed in order to establish trustworthiness.

■ McCray itself, although a state case, goes into some detail, pp. 309–312, p. 1061 of 87 S.Ct. of 386 U.S., about the informer's privilege in criminal trials in federal courts. The Court observed that its task in defining the scope of the privilege "is quite different, of course, from the responsibility of constitutional adjudication". It reviewed and reaffirmed its decision a decade earlier in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and said,

"What Roviaro thus makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity even in formulating evidentiary rules for federal criminal trials. Much less has the Court ever approached the formulation of a federal evidentiary rule of compulsory disclosure where the issue is the preliminary one of probable cause, and guilt or innocence is not at stake. * * *

"In sum, the Court in the exercise of its power to formulate evidentiary rules for federal criminal cases has consistently declined to hold that an informer's identity need always be disclosed in a federal criminal trial, let alone in a preliminary hearing to determine probable cause for an arrest or search. * * * "

We think the following language from Roviaro, pp. 60–61 of 353 U.S., p. 628 of 77 S.Ct. is particularly significant:

"A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way."

The government in its brief here and during oral argument stated that the defendant "well knew the name of the informer in this case", because it was the man (Leonard Aron) who was with him on the motel parking lot. See footnote 2, supra. The defendant's appellate counsel, who was not his trial counsel, does not concede this. For us the record is not positively clear as to knowledge on the part of the defendant. However, we regard the detail as unimportant. What is important is the Roviaro-McCray emphasis on "the fundamental requirements of fairness" and on whether disclosure is relevant and helpful to the defense or is essential to a fair determination of the cause.

■ When we apply this standard we fail to be persuaded by the defense argument. If Aron was one of the informants and this fact was known to the defendant, the issue disappears. If Aron was not an informant or if he was but the defendant did not know it, we are not convinced that disclosure would be relevant or required for essential fairness. After all, there is no dispute whatever that Churder on that November Sunday morning was transporting stolen government property with the knowledge that it was stolen. His defense is only that he was going to turn the property over to his private detective friend and that he thus was on the side of law en-

forcement. With possession and knowledge conceded, we do not see how disclosure could possibly be relevant or essential to a fair determination of the cause. We also fail to see how the absence of identity information hindered the defense in any respect or made it more difficult or, indeed, affected it at all.

■ As was said in *Roviaro*, p. 62 of 353 U.S., p. 628 of 77 S.Ct., "The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense". On this record we must strike that balance heartily and firmly in favor of the public interest.

4. The search of the automobile. The defense argument on this point is that the defendant was arrested "outside of his automobile" and therefore, because "It is clear that only mobile vehicles may be searched without a warrant", the vehicle should have been guarded until a search warrant was obtained.

■ The argument strikes us as almost frivolous. It was made and rejected in Gullett v. United States, supra, 387 F.2d 307 (8 Cir. 1967). Here, if ever, the search of the automobile was one incident to the arrest. The record is consistently to the effect that the search was within 15 seconds of or contemporaneous with the arrest. There was no three hour immobility of the automobile as was the situation in United States v. Stoffey, 279 F.2d 924, 928 (7 Cir. 1960), cited by the defense. The Seventh Circuit, since the Stoffey decision, has readily distinguished it. See United States v. Zimmerman, 326 F.2d 1, 4 (7 Cir. 1963).

This point is, we think, completely controlled by our decision in Drummond v. United States, 350 F.2d 983, 987 (8 Cir. 1965), cert. denied Castaldi v. United States, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542. There, a man named Long was arrested in a Saint Louis restaurant. His automobile was immediately outside on the restaurant's parking lot. We said, "If the car was searched forthwith, as Long's testimony indicated, the search would appear to have been incident to a lawful arrest and, therefore, a reasonable one". There is even greater simultaneity of arrest and search here than in the *Drummond* case.

B. The sentence. Section 641, see footnote 1, requires the imposition of a sentence or fine less severe "if the value of such property does not exceed the sum of $100". It defines "value" to mean "face, par, or market value, or cost price, either wholesale or retail, whichever is greater".

The defense argues that the money orders introduced in evidence were only blanks and that they required insertion of the amount, a restrictive stamp, the name of the payee, the name and address of the purchaser, the stamp of the issuing office, and the initials of the issuing employee; that the witnesses sponsoring the introduction of these money orders all testified that they had no value in the blank state; that the exhibit consisting of one of the validating stamps was introduced with the sponsoring witness stating that she did not know its value; and that the exhibits consisting of two other validating stamps and a limitation stamp were received without any testimony as to value.

Inspector Thorn, however, on direct examination testified that one cannot go to a post office and purchase a blank money order; that they are available only on the thieves' market; and that the approximately 2194 blank money orders and the related equipment here would be worth on the thieves' market "from three to five dollars per money order, maybe ten to twelve thousand dollars for the entire lot". On cross-examination he answered affirmatively the question, "the only way they have any value is if somebody put it all together and stamped money on it and everything else" and conceded that he could not put a salvage price on them "as they now stand".

■■ Of course, under § 641, value of the stolen property is a definite limiting factor in the court's imposition of

sentence and fine. If there is an absence of evidence as to value the greater penalty may not be imposed. The burden is upon the government to prove value in excess of $100. United States v. Wilson, 284 F.2d 407 (4 Cir. 1960).

We are not prepared, however, to accept the defense argument that the value measure contemplated by § 641 is restricted to an open market price "between honest, competent and disinterested men". We apply to the statute what we feel is its obvious, and certainly its practical, meaning, namely, the amount the goods may bring to the thief. This is the obvious intent of the Congress in drawing the distinction between a theft's product value in excess of $100 and value equal to or less than that amount.

Generally, and certainly here, value is a question of fact to be determined by the jury. 53 Am.Jur., Trial, § 196 (1945). This jury was so instructed and it found the defendant guilty "as charged in the Indictment", that is, of concealing and retaining described government property "all of a value in excess of $100.00". Restricting one's self to the money orders alone, one of course can say that they are mere pieces of paper of nominal value, just as one can say that, in a sense, a genuine dollar bill is a piece of paper of nominal value. But a dollar bill brings in exchange goods or services worth one dollar. And blank money orders, when completed by the utilization of the money order equipment, which here was also part of the booty, can produce, according to Inspector Thorn's testimony, much more than the nominal value of pieces of paper; specifically, as he stated with reference to the 2194 blank money orders, they can produce far in excess of the statute's dividing line figure of $100. The inspector's testimony alone adequately and sufficiently supports the jury's verdict as to value. But in addition, as the defense acknowledged in its brief, "Churder said that he was supposed to get $12,500.00 for the money orders in Kansas City".

The government has sustained the burden of proof as to value justifying the sentence in excess of one year. United States v. Ciongoli, 358 F.2d 439, 441–442 (3 Cir. 1966); Jalbert v. United States, 375 F.2d 125, 126 (5 Cir. 1967); United States v. Kramer, 289 F.2d 909, 920–921 (2 Cir. 1961). In *Jalbert* the Fifth Circuit pertinently observed that the statute's value requirement

"* * * was met by the circumstances of the great number of the money orders, their potential in legitimate channels when filled out so as to appear valid, the possession by the defendants of the necessary equipment to make them appear valid on their face, the underworld market for them whether filled in or not, and all the more detailed circumstances, including the entire conduct of the participants in the offense."

The judgment of conviction is affirmed.