UNITED STATES of America
v.
Mitchell ROTHBERG et al., Defendants.
No. 71–CR–164.

United States District Court,
E. D. New York.

Nov. 5, 1971.

---

Robert A. Morse, U. S. Atty., Eastern District of New York, for the United States; Guy Heinemann, Asst. U. S. Atty., and Samuel Sheres, New York City, of counsel.

Michael Metzger, San Francisco, Cal., for defendant Mitchell Rothberg.

Joseph Lombardo, Brooklyn, N. Y., for defendant William F. Wilson.

Ivan S. Fisher, New York City, for defendant Gary Brittman; Michael J. Gillen, New York City, of counsel.

BARTELS, District Judge.

Defendants move to suppress (1) two suitcases recovered from a vehicle driven by Gary Brittman on February 2, 1971; (2) one suitcase recovered from a vehicle driven that same day by Steven Rosenthal; (3) a quantity of hashish seized from the premises at 71–34 171st Street, Queens; (4) a quantity of hashish seized from a 1970 red Ford Transit, Model 1750; (5) any other evidence seized from the premises at 71–34 171st Street, Queens; and (6) all statements and confessions made by Gary Brittman, William Wilson and Mitchell Rothberg.

After a careful consideration of the testimony and evidence, the court makes the following findings of fact and law:

The seizures were made and the statements were taken by the members of the so-called New York Joint Task Force consisting of Detective John Holden, Sergeant William Moriarty, Investigator Lawrence McDonald, Special Agent Thomas Byrne, Detective Robert Ryan, Agent Richard Holborow, Investigator Alfred Visciarelli, Detective James Canavan, Investigator Donald Klopfer, Detective William Brereton and Detective Lawrence LaBriola. At 10 A.M. on February 2, 1971 Officer John Holden received a telephone call from a reliable informant, one James Santamaria, who informed him that defendant Mitchell Rothberg would receive a large shipment of hashish that day and sell or distribute it immediately to customers, one of whom would be defendant Gary Brittman. Santamaria gave Brittman's address as 144–03 Barclay Avenue, Flushing, and added that he would go with Brittman to pick up the hashish later that afternoon or evening in Brittman's white Volkswagen bus. While Santamaria did not know at the time where the hashish deliveries would be made, he

did state that the exact location of the delivery would be determined later by Rothberg and that if Brittman's car proceeded in the direction of the Bronx, the deliveries would be made at some unknown location there, but alternatively, if the car proceeded to Rothberg's home at 71–34 171st Street, the deliveries would be made there.

On the basis of this information, police officers began surveillance of Brittman's house at 10:55 A.M., and at 11:55 A.M. they commenced surveillance of the Rothberg house. They observed at 12:15 P.M. that afternoon a 1970 red Ford Transit, Model 1750, driven by William Wilson, entering Rothberg's driveway. Later that day Rothberg and Wilson were observed removing packages from the Ford Transit and carrying the same into the Rothberg house. At approximately 12:30 P.M. Rothberg drove to Brittman's house in a green Mercedes-Benz followed by the police. Half an hour later he left Brittman's home, carrying a small package and returned to his own home. At 3 P.M. Wilson was seen leaving Rothberg's home and driving the Ford Transit to a parking lot at the corner of Union Turnpike and Queens Boulevard, thereafter returning to Rothberg's home by a taxi.

Throughout the day Officer Holden maintained telephone contact with the informer, and at approximately 6 P.M. Officers Holden and Moriarty spoke with Santamaria in person prior to his entry into the Brittman home. Santamaria repeated the same information to the officers about two possible places of delivery. Shortly before 7 o'clock that evening the police observed Santamaria and his girlfriend, one Susan Turoff, and Brittman and his wife Terry leave Brittman's home and drive to the Rothberg home in Brittman's white Volkswagen bus. About half an hour later the white Volkswagen was seen leaving the driveway. The white Volkswagen bus was then followed for several blocks and stopped by Officers Moriarty and Visciarelli. There were two large barking dogs in the Volkswagen. Moriarty iden-

tified himself to Brittman, the driver, took his keys, and removed Santamaria to a position behind the bus and questioned him about the suspected modus operandi of the distribution of the hashish. Santamaria informed the officer that there was hashish in two suitcases behind the passenger's seat, that Brittman had obtained the hashish at Rothberg's, and that there were other suitcases filled with hashish waiting to be picked up at Rothberg's home. Moriarty seized the suitcases in Brittman's car, opened them and discovered a large quantity of hashish, whereupon he placed the occupants under arrest, and radioed his discovery and Santamaria's information to his fellow-officers who continued to conduct surveillance of the Rothberg home. Soon thereafter a Renault was observed entering the Rothberg driveway and the driver, subsequently identified as one Steven Rosenthal, entered the house, and exited five minutes later carrying a suitcase which he placed in the trunk of the Renault, and drove away. Police officers stopped the Renault, seized and opened the suitcase and discovered that it too contained hashish, and arrested the occupant.

At about 8 P.M. the police approached the side door of the Rothberg residence. Detective Holden knocked, held up his shield to the window on the door, and told Rothberg, who had pulled back the shade, that he wanted to speak to him. Rothberg slammed down the shade and was heard yelling "Bill get the gun! Bill get the gun!" The police then forcibly entered through the side door into the kitchen. Officer Holden saw Rothberg turn into the living room, where he followed and arrested him. Holden then searched Rothberg's person, discovering in his pocket two pieces of paper, subsequently marked Government's Exhibits 1A and 1B. Holden then advised Rothberg of his *Miranda* rights, whereupon Rothberg warned Holden that his father was a detective who worked for the Queens District Attorney and that Holden could get into trouble by this intrusion. When Holden showed

Rothberg his identification, again Rothberg laughed and said "All right, you guys can take the stuff and I won't say anything to anybody," which could mean he would not tell his father. At all events, Rothberg himself admitted that the "stuff" to which he referred was the stuff in the suitcase.

Meanwhile, upon entry Officer Byrne observed Rothberg, who by that time had been brought into the kitchen, and also a suitcase near the kitchen door. He knew of the seizure of hashish from the Volkswagen and the Renault, and had been informed prior to entry that there would be another suitcase filled with hashish in the Rothberg kitchen. Bryne immediately seized and opened the suitcase and found hashish within.

There were conflicting accounts of what happened next. Defendant Wilson and Officer Canavan agree that Wilson was asked for the keys to the Ford Transit and for his identification, and that Wilson said they were in his jacket in an inside room, probably the master bedroom. When Canavan took Wilson into the bedroom it soon became apparent that Wilson had no jacket in that room, that he was unfamiliar with that room, that he was confused and was resorting to a ruse. Canavan again asked Wilson for the keys and jacket, and this time Wilson reluctantly told him that they were in the basement, whereupon Canavan escorted him into the basement with Byrne. Both Canavan and Byrne so testified. According to Holden and Ryan, however, when everyone was in the kitchen ready to leave, and the house had been secured, both Rothberg and Wilson asked for their jackets because it was cold outside. The defendants, according to this version, said the jackets were in the basement, and Holden and the other officers escorted them downstairs. The jackets were folded over a chair, upon the seat of which the officers also discovered a large plastic bag filled with hashish and possibly opium. The officers thereupon seized the bag, and some papers found lying upon a nearby table which they had passed on

their way to the chair, and additionally, a large plastic sheet on the floor upon which were crumpled papers and aluminum foil.

After leaving the Rothberg residence, Wilson was taken by Byrne and Canavan in a car to get the Ford Transit from the parking lot and from there Wilson was taken first to the 107th Police Precinct Headquarters and then to the Joint Task Force Headquarters at Varick Street, where Holden advised Wilson of his *Miranda* rights at least three times, questioned him and subsequently took various inculpatory statements from Wilson. No promises or threats were made to Wilson by the police at any time concerning himself, wife or child. Gary Brittman and his wife were also taken to the 107th Precinct and then to Varick Street. There Holden also advised Brittman of his *Miranda* rights, and he too made a written inculpatory statement. Again there were no promises or threats made to Brittman about either himself or his wife at any time in order to extract the statement. On February 3, 1971, predicated on the events of the prior day and on information given him by Officer Holden, Agent Byrne prepared an affidavit for a search warrant for the Ford Transit, which was issued and executed, resulting in the discovery and seizure of 319 pounds of hashish from the Ford Transit.

## I

### Legality of Searches, Seizures and Arrests

■ It is the court's finding that the informer, James Santamaria, was a reliable informant and that his information was upon important points corroborated by independent observation of the events of February 2, 1971. See Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Manning, 448 F.2d 992 (2d Cir., July 15, 1971) (En Banc). Accordingly, the court finds probable cause for the police to stop and search Brittman's Volkswagen and Rosenthal's Renault, and to seize the suitcases found therein, even before the informer told Moriarty that the Volkswagen contained such suitcases with hashish. See Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); United States v. Wabnik, 444 F.2d 203 (2d Cir. 1971).

■■ Similarly, the police had probable cause for the arrest of Rothberg and Wilson and after showing their identification badges, stating their purpose, and hearing Rothberg yell "Bill get the gun! Bill get the gun!" were justified in breaking and entering the Rothberg residence in order to effect such arrest. United States v. Titus, 445 F.2d 577 (2d Cir., July 15, 1971); United States v. Manning, *supra*. The arrest of both Rothberg and Wilson was valid and the search of their persons incident to that arrest was likewise proper. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

■ Each case depends on the facts, circumstances and the prevailing atmosphere of the premises at the time of the search and seizure. Chimel v. California, *supra*, held that a search incident to a lawful arrest could not go beyond the arrestee's person and the area within his immediate control, from which he might obtain a weapon or destroy evidence which might be used against him. To this limitation, Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), added an exception to the effect that it was permissible for the officers to seize objects which came into their plain view during a search incident to an arrest that is properly limited in scope under *Chimel*. With respect to the kitchen suitcase, the court believes that this search and seizure fell within that exception because the suitcase was evidence of the method of distribution and the officers had definite knowledge that it contained hashish. To permit the officers to seize that suitcase but not to allow them to open it when they knew that it contained hashish and did not

have time to obtain a search warrant seems to this court an untenable distinction. Therefore the court believes that the search and seizure of the suitcase in the kitchen, including opening it, was proper under *Coolidge*.

■ The court, however, is not compelled to rely upon this exception because it believes that there is another ground upon which the search and seizure of the suitcase may legally rest. Obviously, the suitcase was in the plain view of the arresting officers and was evidence of Rothberg's *modus operandi* in the distribution of the hashish. No question can properly be raised that as a closed suitcase it was properly seized. Assuming the *Coolidge* exception is not applicable to the search of the suitcase, there are facts in this case which the court finds constitute a consent on the part of Rothberg to open and search the closed suitcase. It must be remembered that at the time Rothberg questioned the identity of Officer Holden, the latter displayed his shield and identification papers to Rothberg and advised him of his *Miranda* rights. Thereupon Rothberg said: "All right, you guys can take the stuff and I won't say anything to anybody." Upon the facts and circumstances of this case, the court believes a proper consent was manifested, especially since Rothberg had previously been advised of his *Miranda* rights and had been shown police identification on two occasions. Subsequently Rothberg was taken into the kitchen and the suitcase was opened while Rothberg was in that room.[1]

■ A more important question is the search and seizure of the papers and hashish and opium in the basement. Before the officers went into the basement, they had arrested the defendants and taken them into custody. From the testimony of Canavan and Byrne, those two, together with Wilson, were the first to arrive in the basement. The only excuse for the descent into the basement by these officers was to find the keys to the Ford Transit and the identification papers of Wilson. It was not at the request of either Wilson or Rothberg that the officers proceeded to the lower level. They therefore had no consent or legal basis to do so. Holden testified that he went downstairs because both defendants requested their jackets. But this, as far as Wilson is concerned, is in direct conflict with the testimony of Canavan, Byrne, and Wilson himself. Moreover, while Holden was seen in the basement, the other officers do not remember seeing Rothberg in the basement at the same time. The court believes that while Officer Holden was a reliable and honest witness, he was mistaken as to the time and circumstances under which the defendants requested their jackets. The burden of establishing the legality of the basement search was upon the Government, and in view of the significantly conflicting police testimony, the court finds that the Government has failed to meet that burden.

To justify the downstairs search, the Government cites United States v. Pino, 431 F.2d 1043 (2d Cir.1970), and United States v. Lozaw, 427 F.2d 911 (2d Cir. 1970). It is true that under the facts and circumstances of both these cases, searches and seizures of an entire apartment were permitted. This court does not believe, however, that these cases apply to the instant case for these reasons: First, both of these cases involved searches and seizures before the *Chimel* standards were enunciated, although the court in each case, by *dicta*, stated that in view of the inherent necessities and exigent circumstances of the situation, the searches would have been permissible even under *Chimel*; second, since the date of those decisions the Supreme Court decided Coolidge v. New Hamp-

---

[1]. Sometime thereafter, officers heard Rothberg say he believed them to be robbers. The court finds that while this belief may have existed at the time the officers broke and entered the house, it did not exist after Rothberg had been shown the police identification and was given his *Miranda* warnings.

shire, *supra*, in which a plurality of the court made it quite plain that no amount of probable cause would justify a warrantless search beyond the plain view of the officers. Obviously the basement was beyond the plain view of the officers. Moreover, there are no exigent circumstances adduced which would justify the search of the basement.

## II

### Legality of the Search Warrant for the Ford

■ The search of the Ford Transit, Model 1750, was made pursuant to a search warrant which defendants claim is invalid because the informant was unreliable, the affiant did not have personal knowledge of the information in the affidavit, and the affidavit was based upon illegally seized evidence. The court has already found the informant to be reliable. Furthermore, it is unnecessary for the swearing officer to have personal knowledge of the events sworn to in the affidavit if other officers had such personal knowledge and transmitted it to him. While the court has found that some evidence was illegally seized, a substantial portion was not. Moreover, there were sufficient facts stated in the affidavit based upon the validly seized evidence and on the informant's statements and their corroboration by the police to establish probable cause to search the Ford. Thus, the court believes that the search warrant was valid and the evidence obtained pursuant to that warrant is admissible.

## III

### Legality of the Confessions

■ Both Brittman and Wilson contend that their confessions must be suppressed because they were never informed of their *Miranda* rights and because they were threatened with cruel and unusual punishment if they refused to cooperate with the police, including unfortunate consequences for their respective wives. The court has listened carefully to the stories of both Brittman and Wilson. They were horror stories which seven police officers categorically denied and which the court does not believe. Furthermore, Officers Moriarty, Holden, Byrne, and Holborow testified that both Wilson and Brittman were advised of their rights before making any statements. Finally, former Assistant United States Attorney Desmond O'Sullivan testified that on the morning of February 3, 1971 he interviewed Wilson and Wilson told him then that he had been advised of his rights before giving any statement the previous night. Similarly, the court believes the police story that Rothberg was informed of his *Miranda* rights before making the statement that Holden could take the "stuff" and that Rothberg was not coerced when making the statement.

### Conclusion

To summarize, the court finds that (1) the suitcases seized from the vehicle driven by Gary Brittman will not be suppressed; (2) the suitcase seized from the vehicle driven by Steven Rosenthal will not be suppressed; (3) the hashish, opium and papers seized in the basement of the premises at 71–34 171st Street, Queens will be suppressed but the suitcase seized from the kitchen of the premises at the time Mitchell Rothberg was arrested will be admitted as a suitcase of hashish; (4) the hashish seized from the 1970 Ford Transit, Model 1750, will not be suppressed; (5) Exhibits 1A and 1B obtained from the person of Mitchell Rothberg at the time he was searched at the premises of 71–34 171st Street, Queens will not be suppressed; (6) all statements and confessions made by Gary Brittman and William Wilson will not be suppressed but will be admitted into evidence subject to any necessary redaction with respect to Mitchell Rothberg under the *Bruton* principle; and (7) all statements of Mitchell Rothberg will not be suppressed.

This is an order.