UNITED STATES of America, Appellee,

v.

Michael C. JACKSON, Appellant.

UNITED STATES of America, Appellee,

v.

Salvatore (Sam) PELLITIERI, Appellant.

Nos. 77–1602 and 77–1612.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1977.

Decided April 24, 1978.

Rehearing and Rehearing En Banc Denied
May 16 and May 31, 1978.

---

Terrance J. Good, Clayton, Mo., argued and on brief, for appellant, Jackson.

John D. Connaghan, St. Louis, Mo., argued and on brief, for appellant, Pellitieri.

Michael W. Reap, Asst. U. S. Atty., St. Louis, Mo. (argued), and Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief, for appellee.

Before LAY, BRIGHT, and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

On June 23, 1977, a federal petit jury in St. Louis, Missouri, convicted Michael Jackson and Salvatore "Sam" Pellitieri on three felony counts: conspiracy to transport stolen securities in interstate commerce, 18 U.S.C. §§ 371, 2314 (1976); receiving and concealing stolen securities that were part of interstate commerce, 18 U.S.C. § 2315 (1976); and possession of stolen goods or chattels valued at more than $100 that were part of interstate commerce, 18 U.S.C. § 659 (1976). Both defendants were sentenced to five years on the conspiracy charge and seven years on each of the other charges; the sentences are to run concurrently.

In this appeal the defendants challenge their convictions. They contend primarily that blank stock share certificates are not "securities" and therefore not covered by the federal criminal code provisions on which they were convicted, and that even if the blanks are securities, their value is less than that required for conviction under the statutes.

We reverse their convictions on counts I and II, finding that blank stock certificates are not securities under the terms of the

applicable federal criminal code provisions. We affirm their convictions on count III, for possession of stolen goods or chattels, holding that the requisite jurisdictional minimum of over $100 is met in this case.

## I.

On February 18, 1977, the American Bank Note Company of Bronx, New York, delivered five boxes of blank Kraftco share certificates to Novo Air Freight of Newark, New Jersey, for shipment to the National Boulevard Bank of Chicago. Two of the boxes, one containing 1,250 certificates in 100–share denominations and the other 1,750 certificates in "odd-lot" denominations,[1] were missing at the destination point. On February 22, 1977, the Federal Bureau of Investigation was notified of the theft.

In order to recover the certificates, the FBI devised an undercover operation in which agents posed as representatives of a construction company seeking stolen share certificates to use as security for a performance bond. On March 11, 1977, agent Don Taylor called appellant Michael Jackson on the telephone. During their conversation Jackson stated that he could obtain some blank stock certificates, and they agreed to meet that day to discuss the transaction.

The meeting was held at the Rodeway Inn in St. Louis, Missouri. At the meeting Jackson stated that he had access to 200,000 shares of stolen blank Kraftco share certificates and displayed two of the blanks to Taylor. One was a 100-share certificate, and the other an odd-lot certificate that had not been punched out to indicate a definite number of shares. Agent Taylor and Jackson agreed upon a price of forty percent of market value per share.[2] After the meeting a second FBI agent, William Deal, observed Jackson meet with Salvatore "Sam" Pellitieri and a third party. Jackson stated, "Give me the copies." Jackson then returned to Taylor and gave him xeroxed copies of the two share certificates he had earlier displayed.

Negotiations between Jackson and Taylor over the purchase of the blank certificates continued during the next few days. Jackson identified his source as "Sam" but indicated that he was having delivery problems. He mentioned that he might have to go to New York to make the initial purchase. Because the FBI had obtained a warrant to tap the telephone Jackson used, it was able to record many of these conversations as well as conversations between Jackson and Pellitieri concerning the transaction. Pellitieri was kept under surveillance during this period. On several occasions he was observed in the vicinity of the negotiations, and FBI agents overheard him make several incriminating statements.

On March 24, 1977, Pellitieri flew to Buffalo, New York. There the FBI observed him meeting with three other individuals. On March 25, 1977, Jackson received a package from Pellitieri that was sent via Trans World Airlines from New York. The package contained one blank certificate of Alco Products, Inc., stock. That evening Jackson showed Taylor the Alco stock certificate. He stated that if Taylor did not like the Alco stock, "Sam" was in New York and had access to other "samples," which he would forward to St. Louis for approval. The next day Jackson called Taylor and told him that the Alco stock was worthless but that he would call "Sam" and request more samples.

On March 30, 1977, Taylor went to a small office where Jackson was working. He arrested Jackson and seized a file drawer full of documents and a brief case resting on top of the file cabinet as evidence. Pellitieri was also arrested, and the two were brought to trial together.

---

1. Share certificates denominated as "odd-lot" could be punched to indicate between 1 and 99 shares. None of the 1,750 certificates had been punched so, in theory, the box contained a maximum of 173,250 Kraftco shares.

2. The closing price for Kraftco stock was 45⅜ dollars per share on March 11, 1977. Thus, the parties agreed on a price of approximately $18.15 per share for the stolen certificates.

## II.

Neither Jackson nor Pellitieri attack the sufficiency of the evidence. Instead, both assert that the trial court made reversible errors that fall into two broad categories: (1) admission of improperly-obtained evidence; (2) allowing the prosecution to go ahead under the assumption that (a) blank stock share certificates are covered by the provisions of the federal criminal statutes allegedly violated, and (b) the minimum jurisdictional value of the contraband required for prosecution under the statutes was met in this case.

### A. *Admission of Improperly-Obtained Evidence.*

Jackson and Pellitieri make different objections to certain items of the evidence introduced at their joint trial. Pellitieri argues that the district court erred in admitting into evidence the wiretapped and recorded telephone conversations. Jackson does not object to the wiretap evidence, but he claims that the Government on his arrest illegally seized evidence from the closed filed drawer and his attache case, and therefore that evidence should not have been admitted at trial.

█ Pellitieri's objection to the recorded telephone conversations can be dismissed summarily.[3] Our review of the record indicates that the warrant authorizing the wiretaps was based on probable cause and properly issued. We do not find that the supporting affidavit contains any material misrepresentations or omissions. Instead, the affidavit fairly sets out the facts as the Government understood them, and it sufficiently supports probable cause.

Jackson's contention that the evidence seized when he was arrested should have been suppressed by the district court is more troublesome. When Jackson was arrested in an office the FBI seized a drawer full of documents in a file cabinet and an attache case resting on top of the cabinet. Later the FBI searched through the drawer and attache case, finding two items that were introduced as evidence at trial: the blank Alco stock certificate that Jackson had displayed previously to FBI agent Taylor, and a note from Pellitieri to Jackson, apparently mailed from New York, that read:

Could Alco Products be Shell Corp?
100 Sheets [at] 100 shares each—10,000 shares
10,000 shares at 55.00
$550,000.00
Check this figure per share
Studebaker, White Motor Division,
Worthington = Alco Products
Name affiliated with Alco Products

█ The district court denied Jackson's motion to suppress the items taken in the arrest search, stating:

This file cabinet opened on its top and sides, and was so opened at the time of the arrest. Thus, the contents of the cabinet were visible without the need to open drawers. Agent Taylor had also seen defendant place documents concerning false certificates of deposit in defendant's attache case. This case was on top of, or along aside [sic], the file cabinet at the time of arrest. Both the attache case and one drawer of the file cabinet containing bank records were seized at the time of arrest. No search warrant was obtained prior to the seizure.

It is the Court's conclusion that the seizure of evidence was proper. The items seized were in plain view. *Cf.,*

---

**3.** Pellitieri summarizes his argument that the district court erred in admitting into evidence the wiretap conversations as follows:

(a) The authorization of aforesaid wire taps were [sic] not made in compliance with Title 18, Sections 2511, 2515, 2516, 2517 and 2518 of the U.S. Code Annotated.

(b) The information contained in said wire taps was immaterial and irrelevant to the crimes for which defendant was being tried.

(c) The information contained in said wire taps of such a nature that the jurors minds were prejudiced and poisoned against this defendant and caused the jury to return a verdict which was contrary to the evidence.

(d) Procedures as authorized in the above Sections were not followed and resulted in prejudice of the defendant.

In the body of his argument, however, Pellitieri conflates his four sub-points into one complaint: The warrant that authorized the wiretap was issued without probable cause because of various deficiencies in the supporting affidavit filed by the FBI agent Taylor.

*United States v. Rothberg,* 345 F.Supp. 1331, 1334–35 (E.D.N.Y.1971), *rev'd on other grounds,* 460 F.2d 223 (2d Cir. 1972). In admitting the evidence under the "plain view" exception to the search warrant requirement, the district court erred. Although the file drawer and the brief case that the agents seized were perhaps [4] in plain view, the contents of each were not. The plain view doctrine does not authorize search and seizure of items contained within objects like attache cases, file cabinets, and luggage that are themselves in "plain view." *See Coolidge v. New Hampshire,* 403 U.S. 443, 464–73, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *cf. United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977). A "plain view" seizure is limited to items that are clearly incriminating and that are inadvertently encountered in the course of a justifiable intrusion. *Coolidge v. New Hampshire, supra,* 403 U.S. at 468–71, 91 S.Ct. 2022. It cannot be used as justification for rummaging through file cabinets, even with probable cause to believe that incriminating evidence lies within. *Cf. United States v. Chadwick, supra.*

■ The Government's alternative argument justifying the seizure and search as "incident to arrest" under *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), is also invalid. *Chimel*

held that arresting officers could search, without a warrant, only the area within the immediate control of the person arrested, meaning the area from which he might gain possession of a weapon or destructible evidence. *See id.* at 762–63, 89 S.Ct. 2034. As the Supreme Court stated in *United States v. Chadwick, supra,* 97 S.Ct. at 2485:

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest. [Footnote omitted.]

In this case, Jackson was already in custody when the seizure was made. Both the file cabinet and the file drawer were located well outside of his wing-span and, as agent Taylor testified, nothing was available to Jackson that would enable him to destroy the evidence.

■ The Government appears to recognize that the quoted passage from *Chadwick* indicates that this search and seizure was illegal but argues: (1) *Chadwick* should not be retroactively applied,[5] and (2) introduction of the illegally-obtained evidence was harmless beyond a reasonable doubt.

---

4. Agent Taylor testified as follows at the suppression hearing:

Q. Mr. Taylor, so we're not confused, can you tell us once again which drawer in the file cabinet was open and which was closed?

A. Okay, the entire file cabinet was open. As Mr. Jackson had explained, it's a small portable file cabinet in which the whole top and sides come open to expose it. The drawers were exposed on the side and on the front.

Q. On the top drawer, I believe you said that you looked through those and found nothing with regards to the Federal Bank of Dominica, is that correct?

A. That's correct.

Q. You had to pull out a drawer from below to get the file that you were looking for?

A. The second drawer was underneath the first, yes.

Q. Did you open any of the desks or anything of that nature while you were in the office?

A. I glanced at the files that were on top of the desk in there, because these were out in immediate view, and found nothing there that pertained to the Federal Bank of Dominica and didn't seize any.

Q. You opened no drawers other than the ones you have described in the file cabinet?

A. As I recall.

As the testimony indicates, Taylor could see only the file drawers from his position, and the bottom drawer, the one ultimately seized, must have been at least partially obscured by the top drawer. The most he could have seen of the contents of the file drawers from his position would have been the tops of the file folders. Nothing inside the attache case, which was closed, was exposed to his view.

5. The seizure and search occurred on March 30, 1977. The Supreme Court announced its opinion in *Chadwick* on June 21, 1977.

We need not reach this first argument for we agree with the Government's alternative contention that the evidence against Jackson, excluding the two items seized when he was arrested, was overwhelming. The lengthy negotiations between Jackson and agent Taylor, as well as the ten tape-recorded telephone conversations, furnished the Government with enough evidence to convince us that introduction of the illegally-obtained evidence was harmless beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 251, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### B. *The Blank Stock Certificates.*

Jackson and Pellitieri's remaining arguments all relate to whether it was proper, given the evidence, to indict and convict them for violations of 18 U.S.C. §§ 659 and 2315, and conspiracy to violate 18 U.S.C. § 2314.[6] In particular, they argue that (a) blank stock certificates are not "securities" for purposes of those statutes, and (b) the value of the blank certificates is less than the jurisdictional minimum required for conviction under the statutes.

### 1. *18 U.S.C. §§ 2314, 2315.*

■ Count I of the indictment alleged, and became the basis of a conviction, that the defendants conspired[7] to violate 18 U.S.C. § 2314 (1976), by transporting stolen securities in interstate commerce. Count II, also the basis of a conviction, alleged a violation of 18 U.S.C. § 2315 (1976), for possession of stolen securities that were part of interstate commerce. Section 2314 reads, in pertinent part, as follows:

> Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud  *  *  *
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Section 2315 includes the following relevant provision:

> Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken  *  *  *
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

The term "securities," as used in both 18 U.S.C. §§ 2314 and 2315, is defined at 18 U.S.C. § 2311 (1976):

> "Securities" includes any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate

6. Jackson summarizes his argument as follows:
   The court erred in overruling appellant's motions for directed verdict, acquittal, and judgment of acquittal notwithstanding the verdict, or, in the alternative, for new trial. These rulings by the court were erroneous in that the documents in question were not securities within the meaning of U.S.C., Title 18, and the documents in question did not have a value of either $5,000 or $100 or more.
   Pellitieri, although phrasing his objections somewhat differently, in substance makes the same attack:
   I.   The trial court erred in overruling defendant's pre-trial motion to dismiss the indict-

ment for failure of said indictment to state a violation of law.
   II.   The trial court erred in overruling defendant's motion for judgment of acquittal at the close of all the evidence for the failure of the evidence to meet the charges as contained in counts I, II, and III.
   III.   The court erred in refusing to instruct the jury on the legal definition of a stock certificate or a security.

7. Thus, the defendants were convicted under the general conspiracy statute, 18 U.S.C. § 371 (1976), which incorporates as a necessary element of the offense the specific substantive provisions of § 2314.

of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; certificate of interest in property, tangible or intangible; instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing * * *.

The issue posed by this case is that while the section 2311 definition embraces both genuine securities and forged or counterfeit securities, it is silent about genuine blank certificates that, when filled out properly, would designate stock share ownership.

Clearly the blank certificates are not "forged, counterfeited, or spurious representation[s]," and the Government does not argue that they are. Instead, the Government urges that the court find that they are "securities," within the broad language of section 2311. The blank certificates, however, lacked several essential ingredients of a genuine stock certificate: the name of the registered owner, a transfer agent's signature, and a counter-signature.

Moreover, the certificates all bore the words "not valid unless countersigned," and the odd-lot certificates were not punched out to indicate the particular amount of shares represented.[8]

No court apparently has ever confronted the issue raised in this case.[9] In the recent case of *United States v. Speidel*, 562 F.2d 1129 (8th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978). However, this court held that quit-claim deeds are securities under section 2311 and opted for a broad construction of the term "securities" in section 2311:

> We note at the outset that "securities" is defined to *include* the several categories of documents named. This is similar to the wording, also in § 2311, used to define "motor vehicle" and "tax stamp". By contrast, the same section defines some other types of property with the word *means.* Using the plain and ordinary meaning of these terms, it is apparent that the definition of securities is intended to be expansive. The legislative history of this statute reinforces this construction. During the course of enactment, the wording of the bill's definition of securities was changed from "means" to "includes". [Citations omitted.]

Even with a broad construction of the section 2311 definition, however, we cannot class blank share certificates as securities. To be sure, the potential for fraudulent use of these certificates is great. But criminal

---

8. *See* Appendix "A".

9. Analogous blank certificates, such as checks and money orders, that have been stolen and then filled out in order to exchange them for money have formed a basis for prosecution under § 2311 or § 2315. In such cases, the courts have found them to be forged, counterfeited or spurious representations covered by the § 2311 definition of securities. *See, e.g., Gearing v. United States,* 432 F.2d 1038 (5th Cir. 1970) (money order), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971); *United States v. Seay,* 386 F.Supp. 550 (E.D.Ill. 1974) (check), *aff'd,* 518 F.2d 646 (7th Cir.), *cert. denied,* 423 U.S. 995, 96 S.Ct. 421, 46 L.Ed.2d 368 (1975). In *United States v. Ander-* *son,* 359 F.Supp. 61 (E.D.Ark.1973), Chief Judge (now Circuit Judge) Henley ruled that § 2311 covers incomplete bond forms that lacked the countersignatures and names of the payees. In that case, however, the bond certificates were counterfeited. In *United States v. Anderson,* 532 F.2d 1218 (9th Cir. 1976), the court found that genuine stock certificate forms, with the names of fictitious shareholders and complete except for a signature in the blank space provided for the stock transfer agent, were securities within the scope of § 2311. These certificates were deemed as "counterfeit" or "spurious" securities because of the falsification of shareholder names.

statutes are construed strictly, and the blank stock share certificates involved in this case are too far removed from the genuine to class them as securities. The blank certificates simply do not, in their present incomplete form, fall under the express terms of 18 U.S.C. § 2311 definition of securities.[10]

Our holding that the stolen blank stock certificates are not securities necessitates reversal of the convictions on counts I and II. This is not a case where the variance between the proof and the indictment encompasses a mere factual detail. *See, e.g., United States v. Freeman,* 514 F.2d 1184 (10th Cir. 1975) (indictment alleged acts done in own name; evidence established that acts were done in corporate name). Instead, the variance goes to the heart of the indictment; the proof failed to establish one of the crucial elements necessary for prosecution under the particular parts of sections 2314 and 2315 cited in the indictment, stolen securities. The fact that the Government might have succeeded under other sections of the statutes, *see* note 10 *supra,* is not enough to salvage the convictions. The cornerstone of Jackson and Pellitieri's defense was that these certificates were not "securities"; it would be unjust and unfair to uphold their convictions under alternative statutory language. We cannot disregard a variance, such as this one, that affects substantial rights. *See* Fed.R. Crim.P. 52(a).

Because we have determined the convictions of Jackson and Pellitieri under counts I and II of the indictment must be reversed on the grounds that blank stock share certificates are not securities, we do not need to consider their second objection: that the value of the stolen certificates did not meet the jurisdictional minimum of $5,000.

*2. 18 U.S.C. § 659.*

■ Jackson and Pellitieri's third conviction was based on 18 U.S.C. § 659 (1976), which provides in relevant part that:

Whoever embezzles, steals, or unlawfully takes by any fraudulent device, scheme, or game, from any railroad car, bus, vehicle, steamboat, vessel, or aircraft operated by any common carrier moving in interstate or foreign commerce or from any passenger thereon any money, baggage, goods, or chattels, or whoever buys, receives, or has in his possession any such money, baggage, goods, or chattels, knowing the same to have been embezzled or stolen—

Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

Because the indictment and conviction under section 659 is based on possession of stolen "goods" or "chattels," the flaw that resulted in our reversal of the convictions on counts I and II is absent. Although the stolen blank stock certificates are not "securities," we have no qualms about classifying them as "goods" or "chattels." Indeed, Jackson and Pellitieri do not even contest this point.

Instead, the defendants argue that the "goods" and "chattels," consisting of the two Kraftco stock certificates exhibited to agent Taylor, are not worth $100, therefore limiting any imprisonment to one year under the express terms of section 659. In their view, the certificates have no intrinsic

**10.** Our holding does not, as one might first assume, necessarily make impossible a prosecution under 18 U.S.C. §§ 2311, 2314 (1976) for misconduct such as in this case. The Government might have proceeded under two other, more plausible, theories in order to convict Jackson and Pellitieri under §§ 2314 and 2315. One possibility would have been to class the stock certificates as stolen "goods, wares, or merchandise," which are covered by the first paragraphs of both §§ 2314 and 2315. Another approach would have been to proceed under the theory that the certificates are "thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security," covered by the fifth paragraph of § 2314 and the third paragraph of § 2315.

value other than their printing cost. Because the shipping invoice declared a value of $550 for all the certificates, two certificates are worth only forty-eight cents.

In reply, the Government urges that the court adopt a "thieves' market" value for the certificates. Under this method of appraisal, the two share certificates would be worth $3,612.25.[11]

The courts have repeatedly approved the use of bartered or thieves' market value as a proper means of appraising stolen goods or chattels. *See, e.g., United States v. Tyers,* 487 F.2d 828, 831 (2d Cir. 1973), *cert. denied,* 416 U.S. 971, 94 S.Ct. 1995, 40 L.Ed.2d 560 (1974); *United States v. Ditata,* 469 F.2d 1270, 1272 (7th Cir. 1972); *Churder*

*v. United States,* 387 F.2d 825, 833 (8th Cir. 1968). Although we approve of this method in general, we entertain some skepticism that these two pieces of paper were worth $3,612.25.[12] Nevertheless, we believe that sufficient evidence existed to justify a jury verdict that the incompleted stock certificates at issue were worth more than $100.

III.

In summary, the convictions of both Jackson and Pellitieri on counts I and II are reversed; their convictions on count III are affirmed. We remand the cases to the district court for entry of the appropriate judgment.

APPENDIX "A" to follow.

---

11. The "thieves' market" price asserted by the Government is the price at which agent Taylor agreed to buy the blank Kraftco stock certificates, 40% of market value. Market value at the time the price was set was approximately $45.38 per share. The two certificates, one "round lot" of 100 shares and one "odd-lot" that could be punched to a maximum of 99 shares, equalled 199 shares. Thus, 199 × $45.38 × 40% = $3,612.25.

12. A transaction between an FBI agent who is trying to make a case and a thief who is willing to sell for all he can get is shaky evidence of value in the thieves' market or any other market. The most it may show is the gullibility of the thief in believing that some one would pay that much for the invalid securities.