UNITED STATES of America

v.

John DiGILIO et al., Appellant in No. 75–2218.

Appeal of Harry LUPO, in No. 75–2219.

Appeal of Peter SZWANDRAK, in No. 75–2220.

Nos. 75–2218–75–2220.

United States Court of Appeals, Third Circuit.

Argued April 8, 1976.

Decided June 7, 1976.

As Amended June 21, 1976.

As Amended Aug. 4, 1976.

Rehearing and Rehearing En Banc Denied July 19, 1976.

Dissenting Opinion Aug. 10, 1976.

974

Richard A. Green, Rowley & Scott, Katherine L. Boland, on the brief, Washington, D. C., Seymour Margulies, Brigadier & Margulies, Robert Margulies, on the brief, Jersey City, N. J., for John DiGilio.

Frederick P. Hafetz, Goldman & Hafetz, New York City, for Harry Lupo.

Thomas S. Higgins, Asst. Federal Public Defender, D. N. J., Newark, N. J., for Peter Szwandrak.

Jonathan L. Goldstein, U. S. Atty., James A. Plaisted, Asst. U. S. Atty., Newark, N. J., for appellee.

Before CLARK,* Associate Justice, and GIBBONS and HUNTER, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge:

These are consolidated appeals from judgments of conviction and sentence. Appellants John DiGilio (No. 75–2218), Harry Lupo (No. 75–2219) and Peter Szwandrak (No. 75–2220) were indicted, with three other persons not parties to this appeal for violations of 18 U.S.C. §§ 371 and 641. The indictment charged that the defendants conspired to defraud the United States (Count I), and converted to their own use "records of the United States; that is, photocopies of official files of the Federal Bureau of Investigation, of a value in excess of $100.00" (Count II). Two of the defendants, George Kuczynski and Irene Klimansky (now Irene Klimansky Kuczynski), pleaded guilty to the conspiracy count of the indictment and were severed from the trial. The Kuczynskis testified for the government at the trial of the four remaining defendants. One of the defendants, John Grillo, was acquitted at trial on both counts.

A jury found DiGilio, Lupo and Szwandrak guilty on both counts. The jury, however, found Lupo guilty only of theft of property of a value under $100. He was sentenced, therefore, in accordance with the proviso in the third paragraph of § 641[1] on the substantive count, and in accordance with the second paragraph (misdemeanor) of § 371[2] on the conspiracy count.[3] DiGilio and Szwandrak received felony sentences on both the conspiracy and substantive

1. "Whoever [converts to his own use government records]

"Shall be fined not more than $10,000 or imprisoned not more then ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."
18 U.S.C. § 641.

2. "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"If, however, the offense, the commission which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."
18 U.S.C. § 371.

3. The district court sentenced Lupo to a prison term of six months and a fine of $1000 on Count I. On Count II he received a suspended one year jail sentence, and five years probation.

counts.[4] Each appellant contends that his conviction should be reversed because the conduct charged in the indictment and proved at trial was not a crime proscribed by § 641. Each defendant also urges that there were trial errors with respect to the court's charge and its rulings admitting and failing to suppress evidence, which warrant a new trial. Defendants DiGilio and Szwandrak contend that even if their judgments of conviction should be affirmed, they should be resentenced pursuant to the lower range of sanctions prescribed in the proviso to § 641. Finally, DiGilio argues that he should not have been tried at all because he was incompetent to stand trial. We conclude that defendants DiGilio and Szwandrak must be resentenced, but that prior to resentencing the district court must hold a hearing to determine (1) whether DiGilio was competent to stand trial throughout the proceedings in the district court and (2) whether he is competent to be resentenced.

## I. THE FACTS

The evidence at trial tended to show that from the fall of 1971 through the spring of 1972 DiGilio, acting first through Lupo and Szwandrak and later through Grillo, procured the unauthorized copying of documents in the FBI files. The documents which were copied related to an investigation of alleged criminal activity by DiGilio. The unauthorized copies were made by Irene Klimansky, a clerk-typist in the Newark, New Jersey office of the FBI, during her working hours and with government paper and copying equipment. The original records were returned by Klimansky to the proper files. She delivered the copies of the documents to her then-fiancé, George Kuczynski. Kuczynski delivered the copies from time to time to DiGilio's intermediaries, who paid him from $25 to $100 for each delivery. On one occasion Kuczynski received a $200 payment, but this was not related to the delivery of any specific group of documents, and was described as a Christmas bonus. There were multiple deliveries of copies from Klimansky to Kuczynski. Kuczynski broke down some of the deliveries from Klimansky into smaller components, in an effort to get more money from DiGilio. Thus there were more deliveries from Kuczynski to DiGilio's intermediaries than from Klimansky to Kuczynski. The evidence did not connect a payment in excess of $100 to any particular delivery. Nor was there evidence that DiGilio arranged with Kuczynski for the delivery in installments of a previously identified group of documents or records. During the apparent life of the conspiracy, however, over $1000 was funneled to Kuczynski through DiGilio's intermediaries.

Most of the above-recited facts were stipulated by the defendants. In addition, Kuczynski's testimony at trial identified Szwandrak as the initial intermediary from DiGilio, and tended to incriminate DiGilio, Grillo and Lupo as conspirators, and DiGilio as the source of payments and the ultimate recipient of the contraband copies. Kuczynski testified that he passed on documents both to Szwandrak and to Grillo. The remainder of the government's case consisted of statements made to various FBI agents by Lupo and Szwandrak, to which more particular reference will be made in Parts IV and V of this opinion.

## II. THE § 641 VIOLATION

The second count of the indictment charges that the defendants converted to their own use "records of the United States; that is, photocopies of official files of the Federal Bureau of Investigation . . . ." The statute under which they were indicted provides:

"Whoever . . . converts to his use or the use of another . . . any record, voucher, money, or thing of value of the United States . . . shall be fined . . . or imprisoned . . ."

4. DiGilio was sentenced to nine years' imprisonment on Count II and was fined $10,000. A five-year concurrent term of imprisonment was imposed on Count I. Szwandrak received current six month custodial sentences on Counts I and II, and was placed on probation for four and one-half years.

The defendants urge that the facts set forth above do not fall within § 641, because that section does not apply where, as here, the government was not deprived of the use of the information contained in the records. They contend that unauthorized copies of government records are not themselves "records" within the meaning of the statute, and that the unauthorized transmission of information is not proscribed by § 641. They assert that at most, the government lost exclusive possession of the information contained in its confidential records, and that Congress never intended § 641, which is essentially a larceny statute, to protect the governmental interest in exclusive possession of information. Reminding this court of the celebrated cases of Anthony Russo and Daniel Ellsberg[5] and, of more recent vintage, the Daniel Schorr affair,[6] defendants argue that the government's expansive interpretation of § 641, if accepted, would pose serious, perhaps fatal, first amendment, vagueness and overbreadth problems.

The government, on the other hand, is of the view that the misappropriation of information falls within § 641's sanction. It places principal reliance on Judge Friendly's opinion in *United States v. Bottone*, 365 F.2d 389 (2d Cir.), *cert. denied*, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966), holding that the microfilming of a scientific process with equipment owned by the thieves, and the asportation of those copies violated 18 U.S.C. § 2314.[7] *See also United States v. Seagraves*, 265 F.2d 876 (3d Cir. 1959); *United States v. Lester*, 282 F.2d 750 (3d Cir. 1960), *cert. denied*, 364 U.S. 937, 81 S.Ct. 385, 5 L.Ed.2d 368 (1961).

■ It is not necessary to accept the government's thesis in its entirety to hold that in this case a § 641 violation was established. This case does not involve memorization of information contained in government records, or even copying by thieves by means of their own equipment. Irene Klimansky availed herself of several government resources in copying DiGilio's files, namely, government time, government equipment and government supplies.[8] That she was not specifically authorized to make these copies does not alter their character as records of the government. A duplicate copy is a record for purposes of the statute, and duplicate copies belonging to the government were stolen. *See United States v. Friedman*, 445 F.2d 1076, 1087 (9th Cir. 1971); *see also United States v. Rosner*, 352 F.Supp. 915, 922 (S.D.N.Y.1922), *modified*, 485 F.2d 1213 (2d Cir. 1973).[9]

---

5. Ellsberg and Russo were indicted under § 641. The indictment claimed that the defendants had deprived the United States of the exclusive possession of the information contained in the Pentagon Papers. For an excellent overview of the criminal case and a criticism of the application of § 641 to reproductions of original records, see Nimmer, National Security Secrets v. Free Speech: The Issues Left Undecided in the Ellsberg Case, 26 Stan.L. Rev. 311 (1973). *See especially id.* at 317 n. 27, 322.

6. *See e. g.*, N.Y. Times, Feb. 24, 1976, at 1, col. 1; N.Y. Times, Feb. 25, 1976, at 10, col. 1.

7. 18 U.S.C. § 2314 makes criminal the transportation in commerce of stolen "goods". Judge Friendly had no trouble concluding that the microfilms were "goods" within the meaning of § 2314, and had little difficulty in finding the films—the physical embodiment of intangible information—to have been stolen as well. *See* 365 F.2d at 393.

8. On one occasion Klimansky made an extra copy of a transcription of a dictating machine tape.

9. A Committee of the Senate has indicated a belief that existing federal criminal statutes reach the theft of copies of documents containing confidential information:

Intangible personal property is also meant to be broadly construed. It is intended to cover contract rights, including insurance, guarantees and other obligations, privileges, interests, and claims as well as intellectual property. Thus, theft of trade secrets and documents containing confidential information would be covered under section 1731.

In prohibiting the theft of documents—and duplicates of documents containing confidential information—this section reflects current law. Where documents constitute the property "obtained or used," as that phrase has been defined, the "ideas" contained in the documents, rather than the paper on which the ideas are written, establish the value of

We do not, by resting upon the narrower ground that a technical larceny has been proved, intend to imply a rejection of the government's broader interpretation of § 641. In *Chappell v. United States*, 270 F.2d 274 (9th Cir. 1959), the Ninth Circuit refused to hold that misappropriation of an airman's labor to paint private houses during duty hours fell within the statute, because theft of labor or intangibles was not in the nature of a larceny offense. *Compare Burnett v. United States*, 222 F.2d 426 (6th Cir. 1955). Much can be said in favor of the government's argument that *Chappell v. United States, supra*, is inconsistent with the interpretation of § 641 by the Supreme Court in *Morissette v. United States*, 342 U.S. 246, 269 n. 28, 72 S.Ct. 240, 253, 96 L.Ed. 288 (1952):

> "The history of § 641 demonstrates that it was to apply to acts which constituted larceny or embezzlement at common law and also acts which shade into those crimes but which, most strictly considered, might not be found to fit their fixed definitions."

But since there was an asportation of records owned by the United States we need not in this case decide whether appropriation of information alone falls within § 641.[10] The statute gives fair warning that at a minimum, it proscribes all larceny-type offenses. The indictment charges such an offense, and the government proved such an offense.

We recognize that the Department of Justice probably would not have presented this case for indictment but for the informational content of the documents. A statute like § 641 which prohibits the theft of *any* government property of any kind does

indeed, as the defendants observe, vest considerable discretion in the Department of Justice with respect to selective enforcement. The solution to that problem, however, would appear to be legislative. *Cf.* Edgar & Schmidt, The Espionage Statutes and Publication of Defense Information, 73 Colum.L.Rev. 929, 930 (1973). We may not rewrite the statute in order to substitute our own enforcement standards for those of the executive branch. *See Newman v. United States*, 127 U.S.App.D.C. 263, 382 F.2d 479 (1967). We therefore hold that on the law and the facts, the defendants were properly convicted under § 641.

## III. THE VALUATION PROBLEM

In the 1948 revision of the criminal code, Congress consolidated several separate provisions treating the problem of theft from the United States. At the same time, it adopted a suggestion that the punishment provision of a preceding section be amended to make the offense punishable as a misdemeanor when the amount involved was small.[11] The effect of the revision is to divide the statute, for purposes of sanctions, into felonies and misdemeanors.

Once it is established, however, that a person has wrongfully appropriated a government record or other thing of value as defined in § 641, the prima facie case of violation is complete. *United States v. Ciongoli*, 358 F.2d 439, 441 (3d Cir. 1966). Proof that the value of the stolen property is in excess of $100 is an element of the offense if the felony sanction is to be imposed. *See United States v. Ciongoli, supra; United States v. Wilson*, 284 F.2d 407 (4th Cir. 1960); *Cartwright v. United States*, 146 F.2d 133 (5th Cir. 1944); *Ste-*

---

the stolen property. The Second Circuit in *United States v. Bottone*, has held that the copying of documents containing a secret formula and the asportation of the copies violate the 18 U.S.C. § 2314 theft provision even though the originals of the documents were returned to their appropriate place.

Senate Comm. on the Judiciary, Report on the Criminal Justice Reform Act of 1975, 94th Cong., 1st Sess. 675 (1975).

**10.** The government obviously did not consider this merely a theft of information case, because the indictment charges defendants only with converting to their use government records. Section 641 also prohibits conversion of any "thing of value", and the government would presumably rely on this term in an information case.

**11.** *See* 18 U.S.C. § 641, Reviser's Note, discussed in *Morissette v. United States, supra*, 342 U.S. at 266–69 n. 28, 72 S.Ct. 240.

*vens v. United States,* 297 F.2d 664 (10th Cir. 1961) (per curiam); *Churder v. United States,* 387 F.2d 825 (8th Cir. 1968). Before it can be invoked the government bears the burden of proving beyond a reasonable doubt that the misappropriated property has the requisite value.

■ Section 641 defines "value" as "face, par, or market value, or cost price, either wholesale or retail, whichever is greater." Obviously, the stolen records had no "face" or "par" value. No evidence was introduced as to their "cost price." Thus we are concerned with market value. As a general rule, that value will be determined by market forces—the price at which the minds of a willing buyer and a willing seller would meet. *See generally Abbott v. United States,* 239 F.2d 310, 313 (5th Cir. 1956). If no commercial market for particular contraband exists, value may be established by reference to a thieves' market. *See Churder v. United States, supra,* 387 F.2d at 833 (blank postal money orders); *United States v. Ciongoli, supra,* 358 F.2d at 441 (same); *Jalbert v. United States,* 375 F.2d 125 (5th Cir.), *cert. denied,* 389 U.S. 899, 88 S.Ct. 225, 19 L.Ed.2d 221 (1967).

While market value is thus usually determined by conventional market forces of some kind, this court in a related context under 18 U.S.C. § 2314 has recognized that there must be some flexibility with respect to methods of proof of value. *United States v. Lester, supra,* involved the valuation of geophysical maps not known to be traded on an open market. Nevertheless, there was expert testimony that the value of the maps exceeded $5000.[12] This court accepted that proof as sufficient:

> Of course in most instances market value is used because under ordinary circumstances it is easily ascertainable. But where an exceptional type of goods that has no market value is the subject matter of the indictment, any reasonable method may be employed to ascribe an equivalent monetary value to the items.

It would do violence to the purpose of the statute were the Justice Department able to take action against the transportation of one carload of, let us say, household goods worth $5,000 but have their hands tied by semantics when the transporting is of geophysical maps worth a sizable fortune.

282 F.2d at 755 (footnote omitted).

In this case the government introduced the following evidence bearing on the value of the stolen documents: Kuczynski testified that he delivered groups of documents to DiGilio on 25–35 separate occasions, and that he received $25–$100 for each delivery. He also testified that DiGilio had told him that some of the documents he delivered were good and some weren't, and that DiGilio asked for better ones. Regardless of the quality of the documents, DiGilio paid something for each delivery, but the size of any payment was related to DiGilio's assessment of their value to him. Altogether, the evidence showed that Kuczynski received a little over $1000 from DiGilio. This sum included a $200 Christmas "bonus".

The evidence also tended to show that there were many references and cross-references to other persons and files in the stolen documents. There was some testimony that these documents were being peddled around town, and that others besides DiGilio had been approached about purchasing them. There would appear to be sufficient evidence to sustain a finding that a thieves' market for the stolen records existed.

■ We are not persuaded, however, that proof of the existence of a thieves' market satisfied the government's burden of proof as to the value of the misappropriated records. For most tangible objects, some market exists, and proof of that fact alone is not enough to establish value in the market. Since there is no proof regarding exchange price in the thieves' market generally, evidence showing only the existence of that market is insufficient on the question of value for felony sentences under § 641. The felony sentences of DiGilio and Szwandrak can be sustained, if at all, only

12. The opinion does not disclose the basis for this valuation.

if the evidence showing what DiGilio paid Kuczynski is adequate to prove value in excess of $100.

■ Discounting the $200 Christmas gratuity, the sum of the evidence on value was that DiGilio paid Kuczynski about $1000 in exchange for the duplication and transmission of a series of packets of FBI records. Because the thefts occurred in installments, however, each of which would amount to a separate offense, the more-than-$100 figure cannot be attained simply by aggregating the values of all the documents taken.[13] While the evidence showed that Kuczynski sold documents to DiGilio on 25–35 occasions, there is no evidence showing the number of times Klimansky actually copied and took them. That number would appear to be less than the number of sales, since Kuczynski testified that he sometimes broke groups of documents down into smaller packets. There is no evidence establishing that the value of any single document or group of documents taken, as opposed to sold, at any time exceeded $100.

Of course, the price DiGilio paid for each batch of documents he received is some evidence of value. Whether or not the records had any value to DiGilio, however, he paid not less than $25 per delivery. It is plain, then, that DiGilio was paying both for Kuczynski's services in arranging the thefts, and for the documents themselves. The government produced no evidence apportioning the transmittal price between the service, which was purchased, and documents, which were stolen.

■ The government would have us hold that because in the aggregate DiGilio paid over $1000, the jury could infer that at least one of the thefts was of records having a market value of over $100. The case law that has considered the issue of market value does not support the government's position. Judge Sobeloff's opinion in *United States v. Wilson*, 284 F.2d 407 (4th Cir.

1960), is perhaps the leading federal case. There the defendant was charged under § 641 with a single theft of 72 United States Army rifles. The prosecution introduced no evidence of value. The jury, having inspected the weapons, nevertheless convicted defendant of a felony, which required a finding that the weapons were worth more than $100 ($1.39 per weapon). The Fourth Circuit vacated the felony conviction, declining in the absence of any record evidence to take judicial notice that the guns were worth more than the statutory minimum. Nor would the court permit the jury to substitute speculation for hard evidence of value:

> If a value of more than $100.00 had been proved along with the other elements of the crime, the sentence of 7½ years would have been within permissible limits. The Government, however, failed to produce any evidence whatsoever as to the value of the stolen weapons. We are asked to take judicial notice that 72 rifles are worth more than $100.00, but we cannot on the basis of anything in the testimony form a judgment as to value for the purpose of supporting the greater penalty. Nor, in the absence of any proof of value, could the jury be permitted to speculate on this point merely from the appearance of the articles. A fact which distinguishes a violation punishable by imprisonment for not more than one year from a violation punishable by imprisonment for ten years cannot be permitted to rest upon conjecture or surmise. In order to sustain the imposition of the higher penalty, it was as incumbent upon the Government to prove a value in excess of $100.00 as it was to prove the identity of the defendant as the perpetrator of the crime, or the ownership of the property.

284 F.2d at 408.

Wilson was followed in *United States v. Horning*, 409 F.2d 424 (4th Cir. 1969). In

---

**13.** Count II of the indictment does not in terms charge defendants with the theft in installments of the documents and the case does not appear to have been submitted to the jury on such a theory. We reserve decision of the aggregation question in cases where the indictment does so charge and the jury is so instructed. *Compare United States v. Mikelberg*, 517 F.2d 246 (5th Cir. 1975).

that case defendant was indicted under § 641 for stealing tools worth more than $100. The only competent evidence on value was the testimony of a pawnbroker who hocked the tools for $50. The government asked the court to infer from the commonly-known fact that the pawn value of goods is substantially below market value the fact that the tools were worth $100 or more. The court, relying on *Wilson*, declined this invitation.

In *United States v. Thweatt*, 140 U.S. App.D.C. 120, 433 F.2d 1226 (1970), a case involving the District of Columbia larceny statute, the court held that, where the only evidence on the value of stolen clothes was the purchase price four years previously and the testimony that a pawnbroker loaned $55 on the items, the government had failed to carry its burden of proving value in excess of $100:

"When there is a possibility of convicting the defendant of either grand or petit larceny—offenses which carry significantly different penalties and which are distinguished solely by the value of the property taken—it is essential that the government introduce evidence of that value in order to give the jury a firm basis upon which it can render a verdict."

433 F.2d at 1233.

*Accord, Boone v. United States*, 296 A.2d 449 (D.C.Ct.App.1972) (jury can't speculate on value from appearance of stolen property). *See also United States v. Thomas*, 135 F.Supp. 662 (E.D.Pa.1955); *United States v. Barker*, 313 F.Supp. 987 (D.Del.1970); *Carlson v. United States*, 187 F.2d 366 (10th Cir. 1951); *Cooper v. State*, 43 Ala.App. 385, 191 So.2d 224, *cert. denied*, 280 Ala. 711, 191 So.2d 229 (1966); *Johnson v. State*, 102 So.2d 412 (Fla.Dist.Ct.App.1958); *Price v. State*, 165 Tex.Cr. 326, 308 S.W.2d 47 (1957). *Compare Head v. Hargrave*, 105 U.S. 45, 49–50, 26 L.Ed. 1028 (1881).

■■ We conclude that there was insufficient evidence from which the jury could find that any of the several thefts that the government proved was of a record having a value in excess of $100. We do not approve the court's charge that the jury could

determine the cost of gathering and producing the information or the market value in a thieves' market "on the basis of [its] common knowledge and experience, and the reasonable inferences to be drawn from the evidence." No reasonable inferences of market value of property involved in any particular theft could be drawn from the evidence. Permitting juror speculation as to value in the absence of evidence was, for the reasons set forth in *United States v. Wilson* and the cases which have followed it, error.

■ We hold that the evidence does not support the felony convictions of DiGilio and Szwandrak under § 641. That defect does not, however, require us to set aside the jury verdicts. The proper course, assuming the verdicts are otherwise unexceptionable, is to remand for misdemeanor resentencing. *See United States v. Ciongoli, supra*, 358 F.2d at 441; *United States v. Horning, supra*, 409 F.2d at 426. And if the jury verdict of guilt is otherwise unexceptionable, the felony conspiracy sentences will also be vacated and the cases remanded for misdemeanor resentencing. We turn, then, to the remainder of the defendants' objections to the proceedings below.

## IV. *Bruton* ISSUES

In the course of the investigation leading to the instant indictments, FBI agents interviewed defendants Lupo and Szwandrak, and obtained statements in which each incriminated himself and others in the theft of the FBI records. Szwandrak also incriminated himself and others in testimony before the grand jury. At trial these statements and grand jury testimony, in redacted form, were read to the jury. The court cautioned the jury in each instance not to consider the statements as evidence against any defendant other than the utterer. It added that "[i]n order to aid you in adhering to that instruction certain omissions have been made from the statement. . . . by using . . . the word 'blank' . . . ." Since neither Lupo nor Szwandrak testified at trial, no co-defendant could

cross-examine the utterer on any aspect of the statements.

The Lupo and Szwandrak statements, as read to the jury, contained no references whatsoever to DiGilio. In Lupo's statement, all incriminating references to defendant Grillo were omitted, but one non-incriminating reference to Grillo was retained and no references to Szwandrak were deleted. Thus Lupo's statement, as read to the jury, contained incriminating references to Szwandrak. Both Szwandrak's FBI statement and his grand jury testimony, as read to the jury, contained incriminating references to Lupo. Non-incriminating references to Grillo were included but incriminating references to Grillo were excised.

The net effect of the redaction process was to preserve incriminating references to co-defendants who incriminated themselves in pre-trial confessions, but to redact incriminating references to co-defendants who had not. Each of the appellants, citing *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), says that this was prejudicial and reversible error. *Bruton* held that a defendant is denied his sixth amendment right of confrontation when the incriminating confession of a co-defendant is introduced, unless the accused is given an opportunity for cross-examination of his co-defendant.

### A. *Lupo and Szwandrak*

This court has on at least three occasions approved the use at trial of the confessions of co-defendants where *all* references to the appealing party had been redacted. *See United States v. Lipowitz*, 407 F.2d 597 (3d Cir.), *cert. denied*, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969); *United States v. Panepinto*, 430 F.2d 613 (3d Cir. 1970); *United States v. Alvarez*, 519 F.2d 1052 (3d Cir.), *cert. denied*, 423 U.S. 914, 96 S.Ct. 221, 46 L.Ed.2d 143 (1975). These holdings were predicated on our finding that the redacted versions of the confessions did not in any way suggest the appellants' participation in the admitted offenses. That certainly was not the case with the mutually incrimina-

ting hearsay statements of Lupo and Szwandrak. No case in this circuit has authorized the admission of parallel statements by co-defendants as an exception to the *Bruton* rule. The government asserts that such an exception is recognized in the Second Circuit and elsewhere. That notion arises, we think, from an overly broad reading of Judge Hays' opinions in *United States ex rel. Catanzaro v. Mancusi*, 404 F.2d 296 (2d Cir. 1968), *cert. denied*, 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970), and *United States ex rel. Duff v. Zelker*, 452 F.2d 1009 (2d Cir. 1971), *cert. denied*, 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134 (1972). In those state habeas corpus cases the Second Circuit affirmed the denials of the petitions alleging *Bruton* violations such as occurred here, not because it approved of the practice of admitting nonredacted parallel confessions, but because in each instance it could find the hearsay violations harmless beyond a reasonable doubt. *Metropolis v. Turner*, 437 F.2d 207, 208-09 (10th Cir. 1971), another state habeas corpus case, reaches the same conclusion and explains *Catanzaro* as a harmless error case. The only direct appeal which has been called to our attention involving the type of *Bruton* violation committed here is *United States v. Spinks*, 470 F.2d 64 (7th Cir.), *cert. denied*, 409 U.S. 1011, 93 S.Ct. 456, 34 L.Ed.2d 305 (1972). It, too, rejects a *Bruton* challenge not on the ground that there was no violation, but because any error was harmless beyond a reasonable doubt. *See also United States ex rel. Stanbridge v. Zelker*, 514 F.2d 45 (2d Cir. 1975).

 The harmless error rule is not a predicate for the admission of evidence. We expressly disapprove of the suggestion that there is a "parallel statements" exception to the *Bruton* rule in this circuit. Hearsay errors both of constitutional and of non-constitutional dimensions will in appropriate cases be regarded as grounds for reversal, and this includes the hearsay error upon which the *Bruton* court focused.

 Nevertheless, the Supreme Court has made it clear that the constitutional harmless error rule of *Harrington v.*

*California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), is applicable to a *Bruton* violation. *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). In this case Kuczynski testified without contradiction that Szwandrak served as the intermediary between DiGilio and him, disbursing cash in exchange for the stolen government documents. That uncontradicted testimony was corroborated by Szwandrak's confession to the FBI and his statement to the grand jury. In these circumstances the error of admitting the unredacted Lupo statement, which added nothing of substance to the government's case, was, we find, harmless beyond a reasonable doubt.

The evidence against Lupo differs from that against Szwandrak in only one respect. While Kuczynski's testimony directly implicated Szwandrak, it implicated Lupo through the statements made about him by other members of the conspiracy and in furtherance of its ends. This evidence, though different in kind, was not in our view significantly different in weight in this instance. The totality of the evidence of guilt was overwhelming. We find in Lupo's case that the error of admitting Szwandrak's unredacted statements implicating him was harmless beyond a reasonable doubt.

### B. *DiGilio*

DiGilio's *Bruton* argument is postured somewhat differently from that of his co-defendants. All references to his name were deleted from all of his co-defendants' statements. DiGilio argues, however, that because references to the activities of unnamed co-defendants remained, and in some instances those co-defendants were named, the jury must inevitably have associated his name with the blanks in the redacted statements.

The redactions performed here differed qualitatively from the redactions we approved in *United States v. Alvarez, supra,* and *United States v. Lipowitz, supra,* where all references to co-defendants were omitted, and even from the redaction in *United States v. Panepinto, supra,* where all names were deleted. Despite the district court's limiting instruction, the jury might well have drawn the inference that DiGilio was the "blank" referred to in the Lupo and Szwandrak statements. We cannot approve of the practice of limited redaction in which the redaction exception gradually swallows up the *Bruton* rule. We find merit to DiGilio's contention that in the particular circumstances of this case a *Bruton* violation did occur.

The government's case against DiGilio consisted primarily of the testimony of Kuczynski, who testified about incriminating conversations that he had directly with DiGilio. Kuczynski was, of course, an accomplice. But his testimony implicating DiGilio was corroborated to a significant extent by the stipulated fact that only records relating to DiGilio were removed from the FBI office. DiGilio called several defense witnesses, but none of them contradicted Kuczynski's testimony. Thus in DiGilio's case, as in those of Lupo and Szwandrak, we find that the error of admitting without cross-examination the co-defendant statements was harmless beyond a reasonable doubt. *Brown v. United States, supra.*

## V. SUPPRESSION ISSUES

Lupo and Szwandrak urge that the district court erred in admitting their statements because they were obtained in violation of the due process and self-incrimination clauses of the fifth amendment. These appellants contend that the confessions were procured as the result of an illegal arrest, and of an abuse of process of this court, and in any event were involuntary.

### A. *The Facts*

#### (1) Lupo

FBI agents approached Lupo at his place of employment at 8 a. m. on July 14, 1974, identified themselves, and indicated they wished to question him about the theft of the DiGilio records from the FBI office. The agents advised Lupo of his *Miranda* rights and he signed a *Miranda* waiver. At

Lupo's request the agents drove him from his place of employment to conduct the interview. When this interview proved fruitless the agents served on him a grand jury subpoena, signed by an attorney of the Organized Crime Strike Force, commanding Lupo to appear before the federal grand jury in Newark "forthwith." They also advised Lupo to go to the Newark federal courthouse at once. Lupo elected to accompany the agents in their car. They drove to the FBI office, where Lupo remained from 9 a. m. to 2 p. m. During this five hour period Lupo made some incriminating statements. He was then taken to the office of the Organized Crime Strike Force, where agents interrogated him for another two hours. He was then taken to the office of the United States Attorney, who questioned him for an additional 15 minutes. Lupo was then taken to the United States Marshal's office at 4:30 p. m. to await his appearance before the grand jury which was then in session. About this time he requested that his grand jury appearance be postponed so that he could talk with his wife. The FBI agents then drove Lupo to his home, where further conversations took place in front of his wife.

### (2) Szwandrak

On July 17, 1974 two FBI agents went to the home of Szwandrak's mother. Szwandrak did not live there, but she furnished the agents with his address. The agents proceeded to that address and promptly served Szwandrak with a "forthwith" grand jury subpoena identical to that served on Lupo. Szwandrak admitted the agents to his home. The agents read Szwandrak his *Miranda* warnings and he signed a *Miranda* waiver. The agents then questioned him for an hour and a half, during which he made incriminating statements. When the interrogation was completed Szwandrak drove his car to Newark, accompanied by one FBI agent. They went to the office of the Organized Crime Strike Force and later to the office of the United States Attorney. Szwandrak was interrogated three additional times, always after having been advised of his *Miranda* rights. Some incriminating

details were added to his prior confession during these interrogations. At 4:30 p. m. he was taken before the grand jury where he gave the testimony later used at the trial.

### B. *The illegal arrest contention*

Both Lupo and Szwandrak contend that their statements should have been suppressed as the fruits of an illegal arrest. They contend that the "forthwith" subpoena was used as the substitute for an arrest warrant, and as a means for subverting the requirement that a judicial officer make a probable cause determination prior to issuing an arrest warrant. Fed.R.Crim.P., Rules 4, 9. Under Rule 17, Fed.R.Crim.P., the clerk issues subpoenas in blank.

■ We recognize that the misuse of "forthwith" grand jury subpoenas issued in blank pursuant to Rule 17 may circumvent the more rigorous procedural requirements of Rules 4 and 9. But there are several difficulties with the argument of Lupo and Szwandrak that such putative misuse justifies suppression in this case. First, service of the "forthwith" subpoenas took place at a time when the government already had a statement from Kuczynski establishing probable cause for the arrest of both of them. In *United States v. Watson*, 411 U.S. 423, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 U.S. L.W. 4112 (1976), the Court held that where probable cause for arrest exists the fourth amendment does not require a warrant even where, as here, there is ample time to obtain one. It is true that the authority of FBI agents to arrest without a warrant is limited to cases where they have reasonable cause to believe that the person to be arrested has committed a felony. 18 U.S.C. § 3052. *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). We have held above that the government proved only an offense punishable as a misdemeanor. But the standard of proof beyond a reasonable doubt is considerably higher than that of 18 U.S.C. § 3052: "reasonable grounds to believe that the person to be arrested has committed" a felony.

Probably the information already in hand from Kuczynski sufficed to justify an arrest without a warrant. *Cf. Draper v. United States*, 358 U.S. 307, 313–14, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959).

■ We need not rest our holding that neither Lupo's nor Szwandrak's confession was the fruit of an illegal arrest upon the recent decision in *Watson*.[14] In connection with the suppression motions, the district court found as a fact that neither Lupo nor Szwandrak were under any restraint whatsoever at the time they gave their incriminating statements to the FBI agents. *See* 18 U.S.C. § 3501(d). The court's finding, based on credibility judgments, cannot be disregarded. *Government of the Virgin Islands v. Gereau*, 502 F.2d 914 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). For purposes of this appeal there was no arrest legal or illegal.

### C. The abuse of process contention

■ Lupo and Szwandrak next contend that in the exercise of our supervisory power to prevent the misuse of subpoenas issued pursuant to Rule 17, we should prohibit the use of "forthwith" grand jury subpoenas as a means for facilitating investigatory interrogation outside the presumably protective presence of the grand jury. The record here amply supports the contention that the subpoenas were misused. We have in the past made clear that we do exercise supervisory power over the utilization of Rule 17 subpoenas. *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85, 93 (3d Cir. 1973). Rule 17 does not, in our view, authorize the use of grand jury subpoenas

as a ploy for the facilitation of office interrogation. Neither the FBI nor the Strike Force nor the United States Attorney has been granted subpoena power for office interrogation outside the presence of the grand jury. *Compare* 26 U.S.C. § 7602.

■ But it does not follow that we can enforce a suppression remedy for the abuse of Rule 17 process. Congress has decreed in 18 U.S.C. § 3501 that all "voluntary" confessions shall be admissible. In *United States v. Crook*, 502 F.2d 1378, 1380–81 (3d Cir. 1974), *cert. denied*, 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975), we held that once the issue of voluntariness was resolved in the government's favor, the court lacked any supervisory authority to suppress a statement. Thus disposition of the suppression motion properly turns not on whether the statements were obtained as a result of the improper use of Rule 17 subpoenas, but on their voluntariness.

### D. Voluntariness

■ Szwandrak does not contend that his incriminating statements are involuntary in the fifth amendment sense. Lupo urges that his confessions were involuntary because the FBI agents cajoled him into incriminating himself with promises and inducements, and by threats. It is not disputed that Lupo received *Miranda* warnings. Thus, the issue in the suppression hearing was whether in the totality of the circumstances the confessions were voluntarily given. 18 U.S.C. § 3501(a). The trial judge carefully reviewed the evidence of promises, inducements and threats, and conclud-

---

**14.** If it is assumed that the service of the "forthwith" subpoena was constructive arrest, and if it is further assumed that the FBI had probable cause, or at least reasonable cause, at that time, *Watson* would clearly control disposition of Lupo's illegal arrest contention. The arrest, if any, of Szwandrak, however, occurred in his home. Although the majority opinion in *Watson* is not so limited, *see* 423 U.S. at 418, 96 S.Ct. at 825, 44 U.S.L.W. at 4114 n. 6, two Justices did not understand it to decide the reasonableness under the fourth amendment of warrantless arrests in the home. *See, id.*, at 430, 96 S.Ct. at 831, 44 U.S.L.W. at 4118 (Powell, J., concurring); *id.* at 433, 96 S.Ct. at 832,

44 U.S.L.W., at 4116 (Stewart, J., concurring in result). In a recent post-*Watson* case, the California Supreme Court, relying on dicta in *Coolidge v. New Hampshire*, 403 U.S. 443, 480–81, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), held that in the absence of exigent circumstances, the fourth amendment precluded warrantless arrests in the home. *People v. Ramey*, 16 Cal.3d 263, 127 Cal.Rptr. 629, 545 P.2d 1333 (1976). The dissent admitted that *Watson* literally left the question open, but argued that the case indicated that sooner or later such warrantless arrest would be approved. In view of our disposition of related points, it is unnecessary to decide Szwandrak's illegal arrest contention.

ed that Lupo's statements were voluntary. We review the trial court's determination of voluntariness by the clearly erroneous standard. *Government of the Virgin Islands v. Gereau, supra,* 502 F.2d at 922. By that standard of review the conclusion of voluntariness must be affirmed. No purpose would be served by repeating here the factual analysis engaged in by the district court.

In summary, we reject all the grounds for suppression advanced by the appellants.

## VI. DiGILIO'S COMPETENCE TO STAND TRIAL

On April 7, 1975, counsel for DiGilio moved on his behalf pursuant to 18 U.S.C. § 4244 for a determination of his competency to stand trial.[15] the District court directed DiGilio to report to the Carrier Clinic at Belle Mead, New Jersey on May 12, 1975, to be examined with regard to his competency to go to trial on June 10, 1975. DiGilio reported to the Clinic and underwent psychiatric and psychological examination. On June 6, 1975 and for eight trial days in June the district court conducted a hearing on the motion.

Ultimately, the court concluded that DiGilio was competent to stand trial. At the hearing there was substantial evidence, which the district court apparently credited, tending to establish that DiGilio suffers from organic brain disorders of traumatic origin, and functions at a retarded level. The court nonetheless concluded that he was legally competent. That conclusion is reflected in findings of fact dictated from the bench at the conclusion of the hearing

on June 19, 1975 and supplemented by a letter to counsel dated June 24. At the outset the court stated that the defendant in a § 4244 proceeding bears the burden of proving by a preponderance of the evidence his incompetency to stand trial. It then reviewed the medical evidence in some detail and concluded:

"The test is: Can he cooperate with counsel to a reasonable degree? And can he achieve a reasonable understanding of the nature of the charges against him?

I find, in short, that Mr. DiGilio can do both; that while he is mentally impaired because of his organic brain disease, that impairment is not so. extensive that I should declare him incompetent to stand trial. And by the standard I have previously quoted I do find him, in fact, competent to go to trial in this case."

DiGilio's attorneys urge that the court erred in two significant respects. They first complain that in weighing the evidence the court proceeded on the assumption that DiGilio had the burden of proof. As we pointed out above, the court explicitly announced that assumption. They next complain that the court, in evaluating the evidence of competency to stand trial, erroneously took into account DiGilio's committability in the event he were adjudicated incompetent. Certainly the court in its findings made reference to that factor.[16]

■ There is surprisingly little case law dealing with the allocation of the burden of proof in a proceeding under § 4244.[17] Perhaps this absence of discussion reflects the fact that a § 4244 motion may be made by the United States Attorney, by the court on

15. In another case in the district court for the District of New Jersey a similar motion was made on DiGilio's behalf and denied. That case resulted in an acquittal.

16. The court said:

"In the **second** place, we would be in that situation where you have a man indicted by a grand jury, accused of [a] serious crime, and he is not committable and not triable, and therefore perpetually able to avoid answering the charges society has brought against him."

17. The government relies on *United States ex rel. Johnson v. Brierley,* 334 F.Supp. 661, 662 (E.D.Pa.1971), a state habeas corpus case, for the proposition that "[c]ompetency is presumed and the burden is on the petitioner to establish his competency." *See also Swisher v. United States,* 237 F.Supp. 921, 942 (W.D.Mo. 1965), aff'd, 354 F.2d 472 (8th Cir. 1966). *But compare United States v. Tesfa,* 404 F.Supp. 1259, 1267-68 (E.D.Pa.1975), a § 4244 case in which the same district judge placed the burden of proving competency on the government. In *Tesfa* there had been a prior adjudication of incompetency.

its own motion, and "in behalf of the accused." In such a proceeding, no matter by whom it is brought, the critical issue is the capacity of the defendant to assume any burden in any adversarial judicial proceeding. Although § 4244 does not say so explicitly, due process requires that the trial court inquire sua sponte into the defendant's competence if there is reason to doubt it. *See Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). It would make little sense to impose such a due process burden on the court but to place the burden of proof on the defendant. Nor, we assume, would the burden of proof rest with the defendant when the United States Attorney makes the motion. There is nothing on the face of the statute suggesting that the burden of proof should be different when the motion is made "in behalf of the accused." [18]

In the somewhat analogous context of a proceeding under 18 U.S.C. § 4245,[19] the District of Columbia Circuit discussed, but did not resolve, the issue of the burden of proof of incompetency to stand trial. *Fooks v. United States*, 100 U.S.App.D.C. 348, 246 F.2d 629 (1956) (per curiam); 100 U.S.App.D.C. 348, 246 F.2d 631 (1957) (statements of majority and minority on petition for rehearing in banc). In *Fooks* the defendant was in custody following three separate sentences. The federal custodians, on the basis of observation during post-trial confinement, concluded that there was probable cause to believe Fooks was incompetent at the time of his trial. Pursuant to § 4245, hearings were held in each of the sentencing courts and resulted in findings that Fooks was competent. On appeal the panel, consisting of Circuit Judges Miller, Bastian and Burger, in a per curiam opinion wrote:

> "Two of the District Judges specifically ruled that, even if the Government had the burden of establishing such competency beyond a reasonable doubt, as to

which we now express no opinion, it had carried that burden; and it is fairly inferable that the third District Judge, who, by consent heard the testimony with one of the other judges, did likewise." *246 F.2d at 630–31.*

On petition for rehearing in banc the court divided sharply over the effect to be given to the § 4245 certification from the Bureau of Prisons. Then-Judge Burger for a majority of five wrote that a § 4245 certificate created a rebuttable presumption of incompetency, which fell out of the case when the government introduced some evidence of competency. Without deciding the issue that majority said that even if in that posture of the case the burden of proof was on the government, and included an obligation to establish competency beyond a reasonable doubt, the findings of the district judges that this burden had been met were not clearly erroneous. Judge Bazelon for the minority would have held that filing the § 4245 certificate was prima facie evidence of incompetency and that thereafter the government had the burden of proving competency, which in Fooks' case had not been met. It appears to have been common ground, then, that the government in a § 4245 proceeding had to meet some burden of proof. That conclusion is consistent with the provision in § 4245 that "the certificate of the Director of the Bureau of Prisons shall be prima facie evidence of the facts and conclusions certified therein."

We note that § 4245 relief is available only when "the issue of mental competency was not raised and determined before or during said trial." Moreover, § 4244 does not contain any language making a certificate "prima facie evidence of the facts and conclusions certified therein." But the obligation to hold a § 4244 hearing arises only if a psychiatrist's report indicates a present state of mental incompetency. Such a report would seem to serve the same purpose

---

**18.** *Compare* Ill.Ann.Stat. ch. 38, § 1005-2-1, which places the burden of proving competency upon the moving party, and upon the prosecution when the court is the moving party.

**19.** 18 U.S.C. § 4245 establishes procedures for raising and determining after trial issues of mental competency at the time of trial.

as the Certificate of the Director of the Bureau of Prisons in a § 4245 proceeding.

But we do not believe that it is reasonable to construe § 4244 as placing the burden on the defendant to prove incompetency as long as the burden shifts to the government in a § 4245 proceeding after trial. Such a construction might well encourage defense counsel to delay raising the issue of competency until after trial, gambling for an acquittal with the knowledge that the competency issue could be litigated later. We are mindful, as well, of the Court's admonition in *Pate v. Robinson, supra,* 383 U.S. at 384, 86 S.Ct. at 841 that "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." It is equally contradictory to argue that a defendant who may be incompetent should be presumed to possess sufficient intelligence that he will be able to adduce evidence of his incompetency which might otherwise be within his grasp. As the Court said in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) and reiterated in *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the due process rule against trying an incompetent protects a defendant who cannot effectively consult with counsel and cannot comprehend the nature of the proceedings against him.

■ Allocation of the burden of proof will be significant, in theory at least, only in the rare case when, assuming the evidence is weighed by the preponderance of evidence standard, the conflicting evidence is in equipoise in the mind of the fact finder. At that point the triability of a defendant will depend on where the burden of proof is placed. To put the question another way, what we are determining is a rule of law, of due process dimensions, that a defendant, about whom the evidence of competency to stand trial is in equipoise, should or should not be tried. If, as the Court has made clear, the concept of competency to stand trial is grounded in notions of fundamental fairness in the operation of the judicial process, *see Drope v. Missouri, supra,* 420 U.S. at 171–72, 95 S.Ct. 896, the question can only be answered in the negative. Evidence showing competency must be more persuasive than that showing incompetency. Of necessity, then, there is no room for a rule of law placing any burden of proof on the defendant.[20]

■ DiGilio's counsel would have us go further, and hold that the government must prove competency, once it is in issue, beyond a reasonable doubt. The beyond-a-reasonable-doubt test is constitutionally mandated for all elements of a criminal offense. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). But competency to stand trial is not an element of the crimes for which DiGilio was indicted. *Compare Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895); *Government of the Virgin Islands v. Bellott,* 495 F.2d 1393 (3d Cir. 1974) (sanity at the time of the offense). Moreover, the government is not, on every subsidiary issue arising during the course of a criminal proceeding, required to satisfy the beyond-a-reasonable-doubt standard. The preponderance-of-the-evidence test has been utilized in determining the admissibility of evidence under the constitutional exclusionary rules. *See, e. g., Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (plurality opinion) (voluntariness of a confession); *United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (fourth amendment suppression). We do not believe that a more rigorous evidentiary standard is warranted here, and hold that a defendant's competency to stand need be established by a preponderance of the evidence only.

■ Since the district court, in weighing the evidence on what was obviously a close and troublesome issue, explicitly referred to

---

**20.** The district court can, of course, allocate the burden of going forward with the evidence bearing on competency in any manner which will provide for the expeditious development of the facts relevant to its § 4244 determination.

the defendant's burden of proof, and since that placement of the burden may have been decisive in resolving the ultimate issue, we cannot affirm its finding that DiGilio was competent to go to trial. The government would have us hold that because DiGilio's attorney made no simultaneous objection to the court's statement with respect to burden of proof, we should disregard the error. In view of the court's independent due process obligation on the competency issue, *Pate v. Robinson, supra*, there is not in our view room for the mechanical operation of the simultaneous objection rule.

■ There remains the question whether the district court must hold a new hearing, and if DiGilio is found competent, conduct a new trial. Here the hearing was extensive and is not so remote in time as to present insurmountable problems of recollection. While nunc pro tunc determinations of mental competency are not favored, *Drope v. Missouri, supra*, 420 U.S. at 183, 95 S.Ct. 896; *United States v. Pogany*, 465 F.2d 72, 79 (3d Cir. 1972), we have in a state habeas corpus case recently recognized the possibility that a nunc pro tunc determination may be constitutionally permissible. *See United States ex rel. McGough v. Hewitt*, 528 F.2d 339, 343–44 (3d Cir. 1975). The district court is in the best position to determine whether it can, either on the present record or with supplementary testimony, make a retrospective determination of DiGilio's competency throughout his trial. If the court concludes that this can be done, and concludes after applying the proper burden of proof that DiGilio was competent, then no new trial will be required.

■ Since DiGilio's case is being remanded for further proceedings, it is appropriate to note that if the district court intended by its reference to DiGilio's non-committability to suggest that this factor is relevant to the competency inquiry, we do

not agree that it is. Congress has dealt with the problem of committability, explicitly if not satisfactorily, in 18 U.S.C. §§ 4246, 4247. The statute contemplates that in some cases a defendant may be incompetent to stand trial and also releasable. It is not at all clear from the context in which the reference to non-committability was made[21] that the district judge intended anything more than an observation about the statute. But if the fact that DiGilio might be released without trial did weigh in the determination of his competency to stand trial, on remand that factor should be disregarded.

## VII. CONCLUSION

The judgment of sentence of the district court in the appeal of Harry Lupo (No. 75–2219) will be affirmed. The judgment of sentence in the appeal of Peter Szwandrak (No. 75–2220) will be vacated and the case remanded to the district court for resentencing within the lower range of sentences permitted by this opinion. The judgment of sentence in the appeal of DiGilio (No. 75–2218) will be vacated and the case remanded to the district court (1) for a determination (a) whether the court can now decide DiGilio's competency at the time of his trial and sentence, and if so, (b) whether he was competent at those times. If the court concludes that DiGilio was competent at the time of his trial and remains so, he should be resentenced within the lower range of sentences permitted by this opinion. If the court finds that it cannot retroactively determine DiGilio's competency, he must be granted a new competency hearing and if found to be competent a new trial. In such a new trial the district court should decide in the first instance whether, in view of the government's failure of proof on the value of the stolen documents at this trial, double jeopardy considerations will limit the range of sentences to those which we today hold permissible.[22]

---

21. *See* note 15 *supra*.

22. *See Bryan v. United States*, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1948); *United States v. Koonce*, 485 F.2d 374, 381–82 (8th Cir. 1973);

*United States v. Stephenson*, 474 F.2d 1353, 1355 (5th Cir. 1973); *United States v. Howard*, 432 F.2d 1188, 1191 (9th Cir. 1970). *See also North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

## SUR PETITION FOR REHEARING

Before CLARK, Associate Justice, SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

The petition for rehearing filed by appellee in the above entitled case (75-2218 and 75-2220) having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

ROSENN, Circuit Judge, would grant rehearing.

## OPINION SUR DENIAL OF PETITION FOR REHEARING

ROSENN, Circuit Judge.

I believe this case merits consideration by the court en banc. The issues on which the panel vacates the sentence of the defendants DiGilio and Szwandrak have wide reaching ramifications and the Government asserts that they were neither briefed nor argued by the parties in this court.

Count II of the indictment essentially charges that the defendants "commencing on or about November 1, 1971, to on or about June 30, 1972," in furtherance of the conspiracy charged in Count I, stole, purloined, and converted to their own use photocopies of official files of the Federal Bureau of Investigation of a value in excess of $100. This language, especially since it incorporates the conspiracy allegations of Count I charging a scheme to surreptitiously remove photocopies of official files, plainly charges a single plan to steal photocopies of official FBI files over a period of time.

The Government avers that the district court charged the jury that if the installment deliveries of documents from DiGilio's file were made pursuant to a single criminal plan, the values of all such installments could be aggregated for the purpose of determining whether records valued at $100 had been stolen within the meaning of 18 U.S.C. § 641. By its guilty verdict, the jury indicated its acceptance of the single plan theory.

The panel opinion, however, rejects the single plan finding. It rests on the premise that since the thefts occurred in installments, each installment must be treated as a separate offense, and thus "the more-than-$100 figure cannot be attained simply by aggregating the values of all the documents taken." (at p. 980.) The general rule appears to be to the contrary. *People v. Cox*, 286 N.Y. 137, 36 N.E.2d 84, 86 (1941); *Hurlburt v. Falvey*, 298 N.E.2d 897 (Mass.App.1973); Annot., 53 A.L.R.3d 398 (1973). "As long as the larceny is held to be pursuant to a single intent, and one complete illegal scheme, it matters not the length of the period over which the takings continued." *People v. Cox, supra,* 36 N.E.2d at 86. Where the Government charges and proves a series of acts under a sustained plan and intent to commit a single larceny, aggregation of values for the various takings is permissible. *Hurlburt v. Falvey, supra,* 298 N.E.2d at 897. This is the rule in twenty-eight of the thirty state jurisdictions surveyed in 53 A.L.R.3d 398 (1973).

The payments by DiGilio of over $1,000, regardless of whether they included services for an intermediary in arranging the theft, was evidence from which the jury could infer a value of the records to DiGilio of more than $100. This evidence afforded a concrete base for the jury's verdict; it required no speculation by the jury as to the aggregate value.

Accordingly, I dissent from the order denying rehearing en banc. Circuit Judge WEIS joins in this dissent. Circuit Judge ADAMS has authorized me to state that he, too, believes the matter presented here is of sufficient importance to warrant consideration by the Court en banc.