UNITED STATES of America, Plaintiff,

v.

Adam O. RENFROE, Jr., Defendant.

Crim. A. No. 86–23–JRR.

United States District Court,
D. Delaware.

Aug. 21, 1990.

Edmond Falgowski, Asst. U.S. Atty., U.S. Dept. of Justice, Wilmington, Del., for plaintiff.

Nathan Z. Dershowitz, and Victoria B. Eiger of Dershowitz & Eiger, P.C., New York City, for defendant.

## OPINION

ROTH, District Judge.

Defendant, Adam Renfroe, was convicted on June 12, 1986, of bribing a witness in violation of 18 U.S.C. § 201(d) and obstruction of justice in violation of 18 U.S.C. § 1503. At the sentencing hearing on July 28, 1986, the issue of Renfroe's competency at the time of trial and sentencing was raised for the first time. The court denied Renfroe's motion to conduct a competency hearing, pursuant to 18 U.S.C. § 4241. On appeal, the Third Circuit Court of Appeals

found that, on the basis of the evidence presented, there was reasonable cause to believe that Renfroe was not competent to stand trial or to participate in sentencing. The Third Circuit remanded the case for a determination of whether a meaningful *nunc pro tunc* hearing was possible to determine Renfroe's competency at the time of trial and sentencing. *United States v. Renfroe*, 825 F.2d 763, 768 (3d Cir.1987).

On remand, the trial court noted that one affidavit, submitted by a medical expert on behalf of defendant, indicated that a retrospective hearing was not possible, and that three affidavits, submitted by medical experts on behalf of the prosecution, determined that a retrospective competency hearing was possible in view of the contemporaneous records that were available. The court also considered the testimony of Dr. Steven Simring, one of defendant's medical experts, who had stated at the sentencing hearing that "while he was unable at that time to render an opinion as to the Defendant's competency at the time of trial and sentencing, he would be able to do so after the Defendant was detoxed and further testing and information were assembled (including interviewing Defendant's colleagues and family)." *United States v. Renfroe*, 678 F.Supp. 76, 80 (D.Del.1988). On this basis the court ruled that a *nunc pro tunc* competency hearing was possible and ordered Renfroe to undergo psychiatric examination prior to that hearing.

Over Renfroe's objections, he was committed to the Federal Correctional Institution ("FCI") at Butner, North Carolina ("Butner"), for a 30 day psychiatric evaluation.[1] Following that commitment a competency hearing was held on July 17 and 18, 1988. During the course of the hearing, Renfroe sought the trial judge's recusal. This application was denied but was later reconsidered. On August 24, 1988, prior to rendering any decision on the competency question, the trial judge disqual-

ified himself pursuant to 28 U.S.C. § 455(b).

Upon the reassignment of the case, we held a teleconference on August 30, 1988, with the attorneys. Renfroe's attorney expressed two views at that time: first, that the recusal of the trial judge should be retroactive to the remand; and second, that the competency hearing should be held over again before us as the new trier of fact. (D.I. 156).

In regard to the retroactivity of the recusal, we determined that we would make our own independent decision on the question of whether a meaningful *nunc pro tunc* competency hearing could be held in this case. We examined the submissions of the parties, including the affidavits of the psychiatrists, on this issue. We then made an independent judgment that such a meaningful hearing could take place. We also concluded that, in making our determination of competency, we would adopt the testimony given at the competency hearing held on July 17 and 18, rather than hold the hearing over again. (D.I. 144) The parties were given the opportunity to submit additional information for our consideration but chose not to. The issue of Renfroe's competency at the time of trial and of his sentencing has now been fully briefed. On the basis of the record before us, we make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Adam O. Renfroe, Jr., was born on January 12, 1949, in Philadelphia, Pennsylvania. He graduated from Howard University Law School in 1973 and received a Masters Degree in City Planning from Harvard in 1974. For the next five years, he was a prosecutor in the District Attorney's Office in Philadelphia. He then went into private practice in Philadelphia with his sister, Patty. His practice was primarily criminal defense representation.

Renfroe began using alcohol and drugs when he was about 17 years old. (D.I. 134

---

1. Because we have determined that, even considering the psychological reports, prepared at Butner, the government has not met its burden

of proof, we will not consider defendant's argument that the commitment was illegal.

at B–228) From February to July 1986, he was using between .5 and 1.5 grams of cocaine a day. (D.I. 133 at A–300, D.I. 134 at B–254) He was also using alcohol and marijuana daily. (B–229)

Renfroe was indicted in this case on March 4, 1986, and a jury trial was held from June 3-12. Prior to the trial, the attorneys, who were then representing Renfroe, had become concerned that he might be using drugs and for this reason they had spoken to a psychiatrist, Dr. Steven S. Simring. However, there had been no follow up or meeting between Renfroe and Dr. Simring because of Renfroe's adamant refusal at that time to admit drug use. (D.I. 132 at A–101, 108–110) Following his June 12 conviction, Renfroe was finally pressured by his attorneys and his family to see Dr. Simring. Renfroe's first meeting with the doctor occurred on June 20, 1986. Renfroe's father came with him to Dr. Simring's office "because he didn't want him to continue to deny that he had a problem with drugs." (D.I. 59 at 15) Dr. Simring diagnosed Renfroe as being cocaine dependent and concluded from this visit that Renfroe needed treatment very quickly. It was at Simring's insistence that Renfroe entered the Ridgeview Institute in Smyrna, Georgia, on July 11, 1986. (*Id.* at 17, D.I. 133 at A–325, D.I. 134 at B–225)

Dr. Karl Gallegos, who was then doing a fellowship at Ridgeview in the treatment of chemically dependent adults, observed Renfroe at the time of his arrival. Because the testimony of Dr. Gallegos about his medical observations of Renfroe at Ridgeview is the only detailed testimony which describes Renfroe's condition at a time in close proximity with Renfroe's trial and sentencing, we will examine Dr. Gallegos's testimony closely. On the day of Renfroe's arrival at Ridgeview, Dr. Gallegos was called to Renfroe's unit by the nurses because Renfroe was "acutely anxious" about wanting to get his "potions" back. The potions were a bottle of a green, very viscous substance and a powder. Renfroe could not give a "logical linear coherent history of what was going on, what those vials were intended for, why they were such important objects to him." (B–225) After talking to Renfroe for a while, Dr. Gallegos concluded that the potions were from a woman that Renfroe was in a relationship with, "that there was probably some spiritual significance to them, but it was unclear what they were." (*Id.*) During this conversation, Renfroe was concerned about "bugs" and "mikes":

> He was looking in places where "bugs" and "mikes" couldn't be, like in the air, but he was also looking in places where they could be, in corners, under the lamp shade, things like that. This could have been just to put me on—I don't know.

> .  .  .  .  .

> I thought that he was intoxicated, and I thought that he would get better pretty quickly.

(*Id.* at B–225–26)

Dr. Gallegos testified that Renfroe's memory for the events prior to coming to Ridgeview was not very clear.

> It is not apparent to me that he had a real good memory or recall for what was happening to him for about a month prior to coming in, and I could not dissect through the story to determine whether part of it was stress related or if it was drug induced—lack of knowledge or lack of memory.

(B–230) It was difficult for Renfroe to sit still: "[H]e would sit on his hands and move up, get down, shift, stand up, walk around. . . . He was not comfortable, physically comfortable. He was agitated." (*Id.*) Renfroe's memory was not good. He would have difficulty remembering what Dr. Gallegos had discussed with him the day before. (*Id.*) A Ridgeview psychiatrist who examined Renfroe determined that he was not psychiatrically impaired but was chemically dependent on alcohol and drugs, cocaine being the drug of choice. (B–232)

When asked about testimony, given at the competency hearing by other witnesses who described how Renfroe was able to take care of his own law practice during the winter and spring of 1986, Dr. Gallegos

responded that it is difficult for even trained individuals to tell if someone is a cocaine abuser. It is only after the drugs are stopped that the person falls apart:

A lot of the people, you take the drug away and then they go into withdrawal, depending on the drug, the amount, the dose frequency and the duration of the drug or drugs. They go into a decompensated phase that can last for variable lengths of time.

Plus these individuals have lost—by the time they come in the hospital they have a fear of losing their licenses, their families, a lot of other fears. Generally they are healthier when they walk in the door in a lot of ways than they are a couple of days later or even a couple of weeks later.

Q. But in your view these people are not capable of functioning, to carry out the functions—

A. At that point, no. They seem to do better with their drugs.

(B–241–42)

We see a lot of folks who when they come in they go through a period of withdrawal and during that time they are not able to do many of the complex technical procedures that they were able to do the day before, or several days before.

THE COURT: Excuse me. You mean after the absence of the drug, withholding the drug?

THE WITNESS: ... We see people who are fairly well compensated on their drug, especially if it is cocaine. They seem to be able to function professionally very well, and it is when it is taken away that they pretty much decompensate, and there are hours when they are not able to get to their drug that their ability to perform decreases....

The answer to the question is, yes. The next day they don't do as well as they did the day before.

Q. Would it be your view that knowing the history that you took of Adam Renfroe—and you took the period from February 26 through July 28, the day that he was actually sentenced—would it be your view that during frequent periods of time he was incompetent to be able to assist his attorney in preparing his defense?

. . . . .

A. The last day I saw Adam was the last day that he was at the Ridgeview Institute. Even on that day, although he was a lot better when he left than when he came in, I do not believe that he was capable of working or, you know, helping himself with anything that was really sophisticated. And I can give you some reasons if you would like them.

Sort of in reference to other populations *we find that people that are drug addicted and intoxicated at the level that he was still, in withdrawal, and still not to the point where he could even consistently come to a group and talk about the issues in the group, we could not get him to focus. If he was that way in February, March, April, even May and June, there was no way he could adequately help anyone.*

And, you know, sort of hearing the testimony yesterday from the two lawyers, I know what they were going through because that is the way Adam was; he could not give a lucid—if you asked him what color is this, it would be hard to pin him down, and if you asked him about what he was doing yesterday or a conversation three hours ago, it would be very hard to get him to even respond appropriately about what was said. He might remember parts of it but not all of it.

*So the answer is, I don't think that he could have adequately helped in his defense.*

Q. And do you think that that was as a result of his cocaine and other substances that he was abusing at that time?

A. It is my belief that it is the direct result of his multiple drug dependencies.

(B–243–49) (emphasis added)

Dr. Gallegos further testified that professionals who are drug addicts can still function in their profession even though they are unable to adequately manage their personal problems:

What happens frequently with chemically dependent people is they can take care of functions that are professional in nature, particularly when it is something outside of them, like [surgeons] can cut on the patient, but they can't take care of themselves.

(B-264)

As we have cited above, Dr. Gallegos referred to "the testimony yesterday from the two lawyers." This is the testimony given by Raymond M. Brown and Alan Dexter Bowman, who had represented Renfroe from the time of his indictment through his sentencing. Neither attorney had taken steps during that period to have Renfroe's competency questioned. However, they did testify about Renfroe's inability to focus on the preparation of the defense in his case. Brown testified that he met with Renfroe 25 times. Renfroe was late for these meetings at least 60 percent of the time. Brown would block out five hours, Renfroe would show up two hours late and the remaining two or three hours would be punctuated by Renfroe "leaving, going to the bathroom, getting water, and usually I would have to track him down in the office and bring him back into the meeting." (D.I. 132 at A-92) Renfroe would talk to Brown about the case for a couple of minutes but inevitably would go off on a tangent, "it was not any kind of coherent conversation." (A-102)

Well, he wasn't a blithering idiot; he was a person who would focus for a few moments and then go off on a tangent. I mean, he would be there for a minute and then he'd go on, intellectually.

Q. Then would you bring him back to the task at hand?

A. I would bring him back, try some more, then he'd get up and go to the water cooler and be gone for 20 minutes while he talked to the secretaries, and I would drag him back and he would say, no, we would have to get the tape examined again. And it was back and forth and it was a battle, and indeed the battle sometimes was joined by his sister, and he would accuse her of betraying him and trying to force him to deal with the issues.

(A-102-03) At times Brown found that Renfroe would talk about the case for four or five minutes, "but then he would be off." He would be talking about things that had no bearing on the conversation with Brown: "they would be non-sequiturs, they were not coherent, they were associational but not focused." Renfroe's comments might relate to the trial or they might relate to cars, or his sister, or his girl friend. (A-169-70)

In these discussions Brown had difficulty in discussing trial strategy with Renfroe:

Q. Did you try to sit down with Adam Renfroe to discuss his choices among the options that were available to him with respect to the entrapment defense?

A. I did.

Q. And would it be fair to say that he was not able to make a rational choice among his options with respect to the entrapment defense?

A. That's correct. That is one of the conversations I referred to where I went through a series of options, including the entrapment issues, what the requirements were, on due process, and so forth, and where we tried to confront the issue of there being a block in our communications because of the drug problem.

(A-179-80)

At the competency hearing, Brown described the following examples of bizarre behavior by Renfroe:

1. A vital part of the government's case were tapes of telephone calls and conversations. Brown had hired an expert who had verified the electronic integrity of the tapes. However, whenever Brown attempted to discuss the tapes with Renfroe, Renfroe insisted that there was something wrong with the tapes, that they were inaccurate. (A-145)

2. Renfroe would give Brown names of potential witnesses in the drug world to interview about the relationship between two of the key persons involved in the case. These potential witnesses almost never said what Renfroe said they would say, "and it

was a waste of time, energy and money." (A–146–47)

3. Renfroe would write 10 to 15 notes an hour to Brown during his cross-examination of witnesses at the trial. Only one or two out of all these notes made any sense. The other notes "didn't have any relationship to the issue that was being joined between myself and the witness." Brown repeatedly asked Renfroe not to bring the notes up to him but Renfroe persisted. Brown was concerned that the jury was reacting negatively to this behavior. (A–147–48)

4. Renfroe wore a white suit with a white shirt, white tie, white shoes and white socks to court on the day of his sentencing. (A–145, 147, 150) Brown stated:

> His wearing of the white suit struck me as an incredible exercise of poor judgment, to appear before a court as a lawyer knowing that the manner in which you behave in a court in some way expresses your attitude towards the forum and towards the person making the judgments, and to appear in a garb that is at the very least bizarre and inappropriate, which is the opposite of that part of Adam Renfroe that I would wish to present, or that any rational person would want to present to a judge—it is a playful, gay, light-hearted appearance on a day of great sobriety and incredible consequences.

(A–149)

Referring to the *Dusky* standard that a defendant have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), Brown testified at the competency hearing that:

> I felt I had not had effective cooperation from Adam nor that he really perceived what he was up against. He absolutely did not perceive that and I told him that, and I told his parents that, and I begged him to see Simring for those reasons.
>
> Q. You perceived that your client was unable to proceed to trial?
>
> A. I perceived that he had been unable up until the day of trial to effectively cooperate with me or to even match the facts as alleged in the tapes and in the government's statements about the case with the charges.

(A–112–13)

> I had an ongoing belief that Adam was a person who was not in my view satisfying that first part of the Dusky standard. He was not cooperating with me, and he didn't show an understanding of how the facts fit into the indictment.

(A–157)

Brown testified that he did not seek a competency hearing for Renfroe before or during the trial because Renfroe was denying a drug problem, Brown did not have scientific evidence to support a finding of incompetence, and the consequences of a competency hearing, if it did not succeed in a finding of incompetence, would destroy the fabric of Brown's relationship with Renfroe, "and I would be in the worst of all worlds." (A–119) For these reasons, Brown made a decision during the pre-trial and trial period not to bring up the question of Renfroe's competency. (A–161–62)

Alan Bowman, who assisted Brown in Renfroe's defense, agreed that he and Brown had made a "reasoned judgment ... that it wasn't appropriate in the circumstances with which we were confronted" to challenge Renfroe's competency prior to trial. (A–186)

> We believed that there was a very strong possibility that Adam had some psychological problems which we believed was probably induced by drug usage, but we had no way to document, confirm or verify that, and we had specific instructions from the client not to proceed in that fashion.

(A–187)

Dr. Simring has no definitive conclusion, from his contacts with Renfroe in June 1986, about Renfroe's competency to stand trial at that time. (A–327) Brown never asked Dr. Simring to do a competency evaluation of Renfroe. He just told Dr. Simring that he was having difficulty communicating with Renfroe. (A–328–29) Dr.

Simring has come to the conclusion that Renfroe was "acutely intoxicated" during the trial. (A–359) Dr. Simring described typical symptoms of cocaine intoxication as "hyperactivity, poor judgment, euphoria, a feeling of being speeded up, ... lack of concentration, those kinds of things." Renfroe told Dr. Simring in February 1988 that he was using cocaine constantly during the trial and that he was using it more than just at night. (A–370)

In Dr. Simring's opinion, if Renfroe had been incompetent because of drug intoxication during the course of trial preparation and of the trial, it would have been his attorneys who would have been most likely to pick this up. (A–371) Dr. Simring has no doubt that Renfroe was a cocaine abuser and cocaine dependent from February through June 1986. This evidence, however, in and of itself does not enable Dr. Simring to make a decision of competency. (A–379)

Joyce Carmouche, Renfroe's unit manager of FCI, Lexington, also testified for the defense. She stated that Renfroe was agitated and hyperactive when he first arrived at Lexington in late July, 1986. When she would try to talk with him in her office, he would whisper and look under her desk for "mikes" and "bugs." (B–277–79) His jittery, suspicious behavior continued for several months. (B–290) She acknowledged on cross-examination that as of August 29, 1986, she had noted no indication of mental health problems. Renfroe was then found to be functioning within normal limits. (B–294)

In opposition to the above evidence, the United States Attorney presented testimony of Renfroe's competency, both from medical experts and from laymen. Medical testimony was given by Dr. Sally Johnson, a psychiatrist and Director of Forensic Services and the Clinical Research Program at Butner. She testified that in her opinion Renfroe was competent at the time of his trial and of his sentencing hearing. The treatment team at Butner all agreed that Renfroe had "both the rational factual understanding of the charges against him and he was able to assist his attorney with a reasonable degree of rational understanding." (B–33) She based her opinion on Renfroe's evaluation at Butner, as well as the transcripts of his trial and sentencing hearing and the testimony which was given prior to hers at the competency hearing.

Dr. Johnson testified that from the assessment done at Ridgeview "what is evident is at the time closest to his cocaine abuse, when he was tested, he was functioning well above the necessary level intellectually to be competent to stand trial." (B–67) Moreover, she concluded that, even if Renfroe was using cocaine during the trial at the level which he now admits to, "I don't think he was intoxicated, delirious, withdrawing or delusional as a result of that, and so the degree of impairment he experienced, if indeed it existed, in my mind is not sufficient impairment to make him not competent to be able to assist his counsel and to be able to understand the proceedings against him." (B–95) Moreover, Dr. Johnson noted that Renfroe has significant primary gain in being found to be incompetent and that this is "something that I factored into the evaluation...." (B–96)

Dr. George Fowles, a staff psychologist at Butner, also testified that in all likelihood Renfroe was competent to stand trial and to be sentenced in the summer of 1986. (A–259) At Butner, Renfroe was diagnosed as a cocaine abuser, not as cocaine dependent. However, even if he were cocaine dependent, that in and of itself would not necessarily change Dr. Fowles's opinion of Renfroe's competency to stand trial. (A–287) Dr. Fowles acknowledged that the fact that a person is cocaine dependent does not necessarily preclude his being able on occasion to appear to be functioning normally. (A–306)

Dr. Fowles noted that testing at Butner showed that Renfroe suffered from no indication of thought process disorder or of organic brain damage. (A–255, 310) Dr. Fowles had also reviewed the trial transcript: specifically, the way Renfroe was able to focus on the questions, follow the questions, and qualify his answers. From

this review, he found no evidence of dysfunction in Renfroe's performance. (A–312)

> [D]uring his testimony, you look for essentially the quality of his thinking processes, how he is able to respond to questions, is he able to offer a rational explanation when he is asked a question—there is no evidence of any kind of thought disorder, loosening of associations, any difficulty focusing or concentrating on questions—he seemed to be quite on task during his testimony and statements.

(A–313–14)

The government also called Dominick A. Desderio, the FBI agent in charge of the investigation in the Renfroe case. Agent Desderio attended the Renfroe trial. He testified that Renfroe was immaculately dressed and was alert and attentive at the trial. (A–19–23) In addition, the government called three attorneys who had tried cases against Renfroe during the period March–July 1986. They all testified that Renfroe's representation of his clients in the various cases had been effective. (A–37–58, A–61–70, A–389–95) [2]

Our examination of the testimony given at the competency hearing demonstrates support for both positions: that Renfroe was competent at his trial and sentencing hearing to consult with his lawyers with a reasonable degree of understanding, and that he was not. In resolving the issue of competency, we have kept in mind that Renfroe's attorneys, who were the persons who should have taken steps at trial to raise the defense of his incompetency, if appropriate, chose not to do so. We have also kept in mind that "competency" to assist counsel is not the same as "competency" to direct one's defense one's self. On the other hand, we also have concluded that consultation with one's attorneys in preparing the defense to certain offenses may require a greater amount of rationality on the part of the defendant than does the preparation of the defense of other,

less complex offenses. Furthermore, because of the recusal of the trial judge, the court, in evaluating Renfroe's performance at trial, is no longer able to draw upon its own observations of Renfroe at that time.

In assessing the evidence given at the competency hearing, we have, as noted above, paid particular attention to the testimony of Dr. Gallegos and Dr. Simring, who had observed Renfroe in the period between the trial and the sentencing hearing. Dr. Gallegos and Dr. Simring both described the inability to focus, the hyperactivity, the lack of concentration and the poor judgment, all of which could render a drug dependent person unable to assist counsel in his defense. Dr. Gallegos described that type of behavior in Renfroe. This same inability to focus, hyperactivity, lack of concentration and poor judgment is the same type of behavior, which Renfroe's attorneys, Brown and Bowman, complain, prevented them from consulting with Renfroe to adequately defend him.

The parties acknowledge that the burden of proof is on the prosecution to prove that Renfroe was in fact competent. *United States v. DiGilio*, 538 F.2d 972, 988 (3d Cir.1976), *cert. denied sub nom., Lupo v. United States*, 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Our review of the transcript of the competency hearing leads us to conclude that the evidence is evenly balanced. We have contemporaneous observations presented by the witnesses for the defense and we have analysis of the trial transcript, along with subsequently done psychological evaluations of Renfroe, presented by the prosecution. These well reasoned opinions come to opposite conclusions. There is validity to the conclusions reached by the doctors who appeared both for the defense and for the prosecution. This state of equipoise does not, however, satisfy the government's burden of proof.

## CONCLUSIONS OF LAW

Because the government has not met its burden of proving that Adam Renfroe was

---

**2.** In view of Dr. Gallegos's testimony concerning the ability of drug dependent professionals to perform their professional functions (B–246), Renfroe's effective representation of others does not preclude a lack of ability on his part to assist his own counsel in his defense.

competent at the time of his trial and of his sentencing hearing to consult with his lawyers with a reasonable degree of understanding, *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 788, 4 L.Ed.2d 824 (1960) (per curiam), his conviction will be overturned and a new trial will be granted.

An appropriate order will follow.